UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

PREMIER FIXTURES, LLC,

        *Plaintiff,*

        v.

EVOLUTION FIXTURES, LLC, JOSE L.
TELLEZ, J. ANTONIO TELLEZ,
TKL ASSOCIATES, INC., PAUL
SAUDINO and HARRY MAYORS,

        *Defendants.*

------------------------------------------------------------ X

Case No.

**COMPLAINT**

# CV 16 - 3975

**WEXLER, J.**

**TOMLINSON, M.J.**

2016 JUL 18 AM 9:40

    Plaintiff Premier Fixtures, LLC ("Premier" or the "Company") by and through its undersigned attorneys, Crowell & Moring LLP, alleges upon knowledge as to itself and its own actions as well as upon information and belief as to all other matters, as follows:

## SUMMARY OF THE ACTION

    1.    This is a misappropriation of trade secrets case brought pursuant to the federal Defend Trade Secrets Act of 2016 ("DTSA"), the Computer Fraud Abuse Act ("CFAA"), New York misappropriation law and various other tort and contract claims.

    2.    Defendants have expropriated, disclosed and used Premier's confidential and proprietary intellectual property along with other Premier documents, data and information for the benefit of a competing business. They have thereby misappropriated Premier's trade secrets and engaged in unfair competition by exploiting Premier's customer goodwill for their own benefit.

    3.    As part of this misappropriation scheme, some Defendants have also flagrantly breached confidentiality and restrictive covenant agreements with Premier.

4. Most egregiously, Defendants altered, disclosed and used nine pages of Premier drawings and designs to seek and obtain business from, and service, Premier's largest customer even though each of the nine pages contains a warning legend that reads: **"This drawing and design are the intellectual property of Premier Store Fixtures. Any reproduction or alteration without written permission from PSF is prohibited."**

5. Premier is a leading store fixtures business, engaged in the design, manufacture and supply of merchandising displays, fixtures and related accessories for use in retail stores. Premier services customers that operate stores for sporting goods, apparel and other retail brands, such as Dick's Sporting Goods, Phillips Van Heusen, Academy Sports, Target and Nike.

6. During at least the last seven months, former Premier executives and employees have established, developed, operated, assisted, participated in and/or affiliated with a new company, Defendant Evolution Fixtures, LLC ("Evolution"). This new company aims to perform the very same business functions as Premier, target Premier's customer base, seek and obtain business from Premier customers and vendors using Premier designs and products and build the new entity with Premier employees.

7. Evolution is run, operated and/or assisted by Defendants, Jose Tellez ("Jose" or "Jose Tellez"), Premier's former President and consultant, his brother, J. Antonio Tellez ("Tony" or "Tony Tellez"), a former Premier Chief Operating Officer who is now Evolution's President, Paul Saudino ("Saudino"), a former Director of Engineering at Premier, who recently left the Company to become the Vice President of Design and Engineering at Evolution and Harry "Hank" Mayors ("Mayors"), a former head of IT at Premier, who abruptly resigned from Premier in early April 2016.

8.     Both Defendants Jose Tellez and Tony Tellez, along with Defendant TKL Associates, Inc. ("TKL"), owned by Defendant Tony Tellez, are subject to written agreements with Premier that contain restrictions, prohibiting the use and disclosure of Premier's confidential and proprietary information.

9.     Defendant Jose Tellez is also contractually bound to non-competition obligations and restrained from communicating with Premier customers, prospective customers, vendors and employees. His non-competition and non-solicitation requirements are in effect at least through October 31, 2018, but should be extended because Jose Tellez has materially breached those provisions.

10.     Defendant Jose Tellez agreed to these restrictive covenants as a result of an October 2013 asset purchase transaction and subsequent employment and consulting arrangements with Premier. Since the asset purchase transaction, Premier has paid Defendant Jose Tellez over $15 million in exchange for his adherence to various contractual obligations.

11.     After conducting an investigation, Premier has now learned that, over the last few months, Defendants have engaged in several misappropriation acts and extensively communicated with Premier's customers, vendors and employees for the express purpose of operating Evolution to compete directly with Premier.

12.     For example, one of Premier's Chinese vendors, Xiamen Mavis Display Fixtures Co., Ltd. ("Mavis"), informed Premier at the end of June that Evolution sent it a Request for Quote ("RFQ") to produce ball fixtures this year for Dick's Sporting Goods – Premier's largest client – that Premier had previously provided Dick's in 2014 and 2015. Mavis shared with Premier Evolution's RFQ, which attached a set of fixture drawings and designs.

13.     Dick's Sporting Goods Senior Director of Purchasing has, similarly, confirmed that Defendant Jose Tellez held between seven to ten communications with him this year to seek work on behalf of Evolution.

14.     And various Premier employees have acknowledged that Defendant Jose Tellez has solicited or attempted to hire them to work at Evolution. During the week of June 6, 2016, in fact, three of Premier's Richmond, Virginia employees traveled to New York to meet with Defendant Jose Tellez about working for Evolution.

15.     This is only some of the evidence and information Premier has assembled demonstrating misappropriation acts and breaches of confidential requirements and restrictive covenant obligations by the Defendants.

16.     Premier is entitled to the full range of compensatory, lost profits and consequential damages as well as recoupment and disgorgement of all monies paid to Defendants Jose Tellez and Tony Tellez under their respective agreements. Premier is also entitled to exemplary damages including more than double damages for Defendants' willful and malicious misconduct. Finally, both by statute and contract, Premier is entitled to recover all attorneys' fees, expenses and costs in having to bring this action.

17.     Defendants' misconduct has also caused Premier immediate irreparable harm not adequately remedied at law, and the Court should issue both a preliminary and permanent injunctive relief that, among other things, requires: (1) all Defendants to cease engaging in actual, continued and threatened misappropriation of Premier's trade secrets and return to Premier all confidential and proprietary Premier documents, data and information in their possession; (2) Defendant Jose Tellez to cease and desist operating and/or assisting Evolution in

-4-

any way; and (3) Defendants Jose Tellez, Tony Tellez and TKL to abide by confidentiality and restrictive covenant obligations with Premier and for a reasonable extended period of time.

## PARTIES

18. Plaintiff Premier Fixtures, LLC is a Delaware limited liability company that does business as Premier Store Fixtures. Its headquarters at 400 Oser Avenue, Suite 350, Hauppauge, New York 11788 and has other operations in the United States and internationally.

19. Defendant Evolution Fixtures, LLC is a Florida limited liability company that does business as Evolution Store Fixtures. Its principal place of business address at 13845 Alvarez Road, Suite 100, Jacksonville, Florida 32218.

20. Defendant Jose Tellez was Premier's President from 2000 through July 17, 2014. Thereafter, Jose functioned as a consultant to Premier until his consulting agreement was terminated for cause on July 18, 2016. Jose resides at 11 Cedar Ridge Lane, Dix Hills, New York 11746.

21. Defendant Tony Tellez worked at Premier from January 2001 until June 2013. According to Tony's LinkedIn profile, he first functioned as the Company's Chief Operating Officer and then as Director of Business Development. Tony is currently the President and Managing Member of Evolution. Tony is also President of Defendant TKL Associates, Inc. Tony resides at 2791 Cypress Dome Court, St. Cloud, Florida 34772.

22. Defendant TKL Associates, Inc. is a Florida Corporation that is owned by Defendant Tony Tellez and his wife, Keri Tellez. Tony Tellez is the President of TKL, which is located at 2791 Cypress Dome Court, St. Cloud, Florida 34772.

23. Defendant Paul Saudino was Director of Engineering at Premier from September 13, 2010 through May 20, 2016. According to his LinkedIn profile, he has been Vice President

Design & Engineering for Evolution since June 2016. Saudino resides at 46 Linwood Avenue, Farmingdale, New York 11738.

24.     Defendant Harry "Hank" Mayors was the head of IT for Premier from April 3, 2006 through April 8, 2016 when he resigned. Mayors resides at 361 Auborn Avenue, Shirley, New York 11967.

## JURISDICTION AND VENUE

25.     This Court has federal subject matter jurisdiction pursuant to 18 U.S.C. § 1836(c), 18 U.S.C. § 1030(a)(2) and 28 U.S.C. § 1331 because Plaintiff has asserted a federal claims under the DTSA and the CFAA. Pursuant to 28 U.S.C. § 1367, the Court also has supplemental or pendant jurisdiction over Plaintiff's remaining claims insofar as those claims form part of the same case or controversy as the federal question claims under Article III of the United States Constitution.

26.     This Court has personal jurisdiction over all of the Defendants under principles of specific and general jurisdiction as each has sufficient contacts with New York. In addition, Defendants Jose Tellez, Tony Tellez and TKL have consented to jurisdiction in the Eastern District of New York located in Brooklyn, New York.

27.     Venue in the Eastern District of New York is appropriate under 28 U.S.C. § 1391 as a substantial part of the actions giving rise to the claims herein occurred in this District. In addition, Defendants Jose Tellez, Tony Tellez and TKL have consented to venue in the Eastern District of New York located in Brooklyn, New York.

## FACTS

## I.  PREMIER STORE FIXTURES BUSINESS

### A.  Premier's Operations

28.     Premier was founded and formed in 2000 as Premier Store Fixtures, Inc. ("Premier Inc.") to provide customized interior fixtures and merchandising displays for major retail stores.

29.     Premier's products and services include the design, engineering, manufacturing, and logistics capabilities used in the opening, remodeling and refreshing of stores.

30.     Premier's headquarters is located in Long Island, but the Company also has United States facilities in Virginia, Illinois and on the West Coast. The Company does business through state-of-the art manufacturing facilities in China and Taiwan and has offices in Hong Kong as well.

31.     Since its founding, Premier has designed store layouts and retail programs for several major retailers, including among others, American Eagle Outfitters, Dick's Sporting Goods, Phillips Van Heusen, Academy Sports, Field and Stream, Finish Line, Nike, Target and TJMaxx.

32.     To develop and sustain these customer relationships, Premier has expended significant time, resources and investment, enabling it to garner substantial customer goodwill with many of its customers.

33.     Similarly, Premier has expended significant resources on its design capabilities, which are tailored specifically to a given customer's particular needs. Premier's design department possesses full graphic development and printing capabilities, allowing the company to produce various and specialized design specifications, from high-end, four-color silk screening to large format graphics that utilize the very latest software.

34.    Premier's engineering department complements the designers' efforts.    All engineering is performed and documented in-house using cutting-edge 3D design and development software, including Strata CX, SolidWorks, and AutoCAD.

35.    Premier services its customers through dedicated client teams. The Company has obtained intimate knowledge of particular customers' business needs and preferences that has resulted in substantial customer goodwill with these clients.

**B.    Premier's Asset Purchase and Membership Interest Transactions**

**1.    The October 2013 Asset Purchase Transaction**

36.    In October 2013, Premier Inc.'s assets were sold to Premier Fixtures, LLC, a limited liability company, with LongVue Capital owning a majority of the member units and the original owners, including Jose Tellez, retaining minority equity interests.

**a.    The Asset Purchase Agreement**

37.    To execute the asset purchase transaction, Premier Inc. and its stockholders, including Defendant Jose Tellez, entered into an Asset Purchase Agreement ("APA") with Premier Fixtures, LLC.  Article X of the APA included restrictive covenants lasting for five years, through October 31, 2018.

38.    Pursuant to the APA, Premier Inc. sold and transferred to Premier Fixtures LLC all rights, title and interests in "Acquired Assets" including, among others, "relationships with Customers of the Business and Customer lists relating to the Business, together with associated Goodwill [and] Proprietary Information . . . relating to the Business."

39.    Through the APA, Premier Fixtures, LLC also acquired from Premier Inc. "all Intellectual Property owned by [Premier Inc.] and all of the rights of [Premier Inc.] in any Intellectual Property licensed by [Premier Inc.]. Among other items, the APA defines "Intellectual Property" to include: "all trade secrets and confidential business information

(including ideas, research and development, know how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and costs information, and business and marketing plans and proposals)."

40.     Defendant Jose Tellez received over $5 million dollars as a result of the asset purchase transaction and percentage membership units in Premier. This included $135,714 "in consideration for . . . entering into the Restrictive Covenants" set out in Article X of the APA.

41.     As part of the October 31 asset purchase transaction, Defendant Jose Tellez also entered into an employment agreement with Premier Fixtures, LLC ("Jose's Employment Agreement") to function as "the Company's Senior Executive Vice President, reporting directly to the Company's Board of Directors." The Agreement provided that Jose "desires to be employed by [Premier Fixtures, LLC] and to remain employed by the Company, and acknowledges that he has been given access and will be given access to certain confidential information and trade secrets developed and maintained by the Company."

42.     Pursuant to Jose's Employment Agreement, Defendant Jose Tellez agreed to an annual salary of $350,000 plus incentive compensation and to restrictive covenants restraining his use and disclosure of Premier's confidential information as well as imposing on him non-competition and non-solicitation obligations.

**b.  Jose's Separation Agreement and Consulting Agreement**

43.     On July 17, 2014, Defendant Jose Tellez agreed to a Separation Agreement and Release of Claims ("Jose's Separation Agreement") with the Company including an attached Consulting Agreement (the "Consulting Agreement").

44. Pursuant to the Consulting Agreement, Premier retained Defendant Jose Tellez as a consultant through October 31, 2016 with Jose Tellez "agree[ing] to perform for the Company certain services . . . set forth in Exhibit 1 . . . subject to the limits specified by the Company."

45. Exhibit 1 to the Consulting Agreement identified Jose's services as: "consultation, research, assistance, execution, support, and other such services as the Company may require in connection with matters related to the manufacturing, purchasing, quoting, shipping, transportation, logistics and delivery with respect to the Company's vendors and customers . . . ."

46. Exhibit 1 required Defendant Jose Tellez to refrain from communicating (without the Company's written approval) with anyone at the Company other than identified Employee contact or with any Premier customers or vendors.

47. The Consulting Agreement also required Defendant Jose Tellez to "be bound by and abide by the terms contained in . . . the Restrictive Covenant Agreement" attached as Exhibit 2 to the Consulting Agreement.

48. Jose's Separation Agreement qualified that if Defendant Jose Tellez "violate[d] any provisions of the Restrictive Covenant Agreement" attached to the Consulting Agreement, "no further payments, rights or benefits under . . . the Employment Agreement will be due to [him]." This Restrictive Covenant Agreement is substantively identical to the restrictive covenants Defendant Jose Tellez agreed to as part of his Employment Agreement.

49. On August 6, 2014, Premier's lawyers wrote to Defendant Jose Tellez's lawyer, to advise that Mr. Tellez had not been abiding by the restraints on communications in the Consulting Agreement, and stating "[a]s a reminder, Premier's obligations (including payment of Mr. Tellez's compensation) under the Consulting Agreement are conditioned upon, Mr. Tellez's compliance with the terms thereof, and any future correspondence or contact with employees,

customers or vendors of Premier will be handled in the manner set forth in the Consulting Agreement."

50. Pursuant to Jose's Employment Agreement and his Consulting Agreement, Jose Tellez has received approximately $1,558,885 in compensation from November 1, 2013 through June 2016.

51. On July 18, 2016, Premier's lawyers notified Defendant Jose Tellez that the Company had learned of his material breaches of the Consulting Agreement, which required that the agreement be terminated for cause.

### 2. The July 2015 Membership Interest Purchase Transaction

52. On July 24, 2015, Tailwind Premier Holdings, LLC ("Tailwind") acquired all of the outstanding membership interests in the Company, including those held by Defendant Jose Tellez, through the execution of a Membership Interest Purchase Agreement.

53. As a result of the membership interest purchase transaction, Defendant Jose Tellez's received $8,655,000 from selling his equity interests in the limited liability company.

54. The total amount of monies received by Defendant Jose Tellez from Premier since Premier, Inc. was sold to Premier Fixtures, LLC is approximately $15.2 million.

55. Among other relief, in this action, Premier seeks recoupment of all monies and payments made to Defendant Jose Tellez, resulting from his misappropriation of Premier's trade secrets and breaches of the APA, the Consulting Agreement and other related obligations.

## II. PREMIER'S CONFIDENTIALITY PROTECTIONS

### A. Premier's Confidentiality Policies and Guidelines

56. Premier closely guards its confidential and proprietary information. For example, the Company restricts information about a customer's needs to members of particular client services teams and particular Company designs and drawings are protected by password entry.

57.     Premier emphasizes to Company employees the need to protect confidential and proprietary information. It provides employees with a handbook, underscoring that: "[t]he protection of confidential business information and trade secrets is vital to the interests and the success of Premier. Such confidential information includes, but is not limited to, the following examples: Computer Programs and Codes, Customer Lists, Customer Preferences, Financial Information, Marketing Strategies, Pending Projects and Proposals, and Research and Development Strategies."

58.     In the handbook, Premier explains that certain employees are required to sign a Non-Disclosure Agreement "because of sensitive information" and warns that "[e]mployees who improperly use or disclose trade secrets or confidential business information will be subject to disciplinary action, up to and including termination or employment, even if they do not actually benefit from the disclosed information."

59.     In addition, Premier warns employees that "[e]mail may not be used to solicit other commercial ventures... outside organizations, or other nonbusiness matters" and "[e]mployees should not use a password, access a file, or retrieve any stored communication without authorization."

60.     Premier provides employees with a list of prohibited behaviors as to the Company's confidential information. These include, among others, "[s]ending or posting confidential materials, trade secrets, or proprietary information outside of the organization." They also include "[a]ttempting to break into the computer system" and "[j]eopardizing the security of the organization's electronic communications systems."

61.     Premier also provides its employees with examples of "infractions of rules of conduct that may result in disciplinary action, up to and including termination of employment."

These include "[u]nauthorized disclosure of business 'secrets' or confidential proprietary information." They further include: "[u]nauthorized use of telephones, mail system, or other employer-owned equipment." Finally, Premier makes clear to employees that they may not engage in "[t]heft or inappropriate removal" of Company property including its intellectual property and other trade secrets.

62.     During the time they were employed by Premier, each of Defendants Jose Tellez, Tony Tellez, Paul Saudino and Hank Mayors were required to adhere to and abide by these Premier policies and guidelines designed to protect and safeguard Premier's confidential and proprietary information.

**B.     Premier's Confidentiality Agreements with Jose Tellez, Tony Tellez and TKL**

63.     Premier also enters into express confidentiality agreements with specific employees and/or former employees. Defendants Jose Tellez, Tony Tellez and TKL are subject to specific confidentiality obligations with Premier.

**1.     Jose Tellez**

64.     Defendant Jose Tellez agreed to confidentiality restrictions in the APA and in the Restrictive Covenant Agreement, attached as Exhibit 2 to the Consulting Agreement.

65.     In APA Section 10.1, Defendant Jose Tellez agreed that "[u]ntil the end of the five (5) year period" or through October 31, 2018, he would "keep all Proprietary Information of [Premier] . . . confidential and" would "not . . . disclose any such Proprietary Information to any Person." He also agreed "not [to] use such Proprietary Information."

66.     The APA defines "Proprietary Information" broadly to include:

> any information of a Person, that is not already generally available
> to the public (unless such information has entered the public
> domain and become available to the public through fault on the
> part of the Party to be charged hereunder), which constitute trade

secrets, personally identifiable financial information, or personal health information under governing law, including without limitation:... (b) the identity, authority and responsibilities of key contacts at each such Customer;... (e) the types of products and services to be provided specifically to any such Customer; (f) the specific products and/or services purchased by or for such Customer; (g) product or service manuals and guidelines, pricing policies and related information, marketing manuals and plans, and business strategies, techniques and methodologies; (h) financial information, including information set forth in internal records, files and ledgers, or incorporated in profit and loss statements, fiscal reports and business plans;... and (l) any other information constituting a trade secret under the governing trade secrets law.

67.     Additionally, in Section 2(a) of his Restrictive Covenant Agreement (attached to his Consulting Agreement), Defendant Jose Tellez "agree[d] that at all times during the time I am a consultant of the Company and at all times thereafter to hold in strictest confidence and to use or disclose . . . any Confidential Information of the Company."

68.     Section 2(a) defines "Confidential Information" broadly to include "proprietary or confidential information, technical data, trade secrets or know-how, including [among many other types of information] . . . cost information, [and] terms and conditions of business relationships with customers... inventions, processes, formulas, technology, designs, drawings, engineering . . . ."

69.     In Section 6(a), the Restrictive Covenant Agreement directs that Premier " shall have the right, in addition to any other rights it may have under applicable law, to obtain from any court of competent jurisdiction preliminary and permanent injunctive relief to restrain any breach or threatened breach" by Jose Tellez of particular restrictive covenants, "or otherwise to specifically enforce any such covenant . . . as well as to obtain damages and an equitable accounting of all earnings, profits and other benefits arising from such violation, which shall be cumulative and in addition to any other rights or remedies which [Premier] may be entitled."

70.     In connection with creating, developing, operating and assisting Evolution, Defendant Jose Tellez has violated the confidentiality restrictions in the APA and the Restrictive Covenant Agreement and Premier is entitled to full monetary and injunctive relief as specified by those contracts.

## 2.     Tony Tellez and TKL

71.     Defendant Tony Tellez entered into a separation agreement ("Tony's Separation Agreement") with Premier on June 7, 2013 on behalf of himself and as President of Defendant TKL Associates, Inc. ("TKL"). The signature page states that TKL "agrees to be bound by the terms, obligations and restrictions to the same extent as Jose Antonio Tellez pursuant to the foregoing Agreement." Tony's Separation Agreement incorrectly referred to TKL as TLK, but that was a clerical error.

72.     Section 8 of Tony's Separation Agreement provides that "[f]or three (3) years after the separation date," or through June 3, 2016, Defendants Tony Tellez and TKL agreed that they would "not disclose to any third party or directly or indirectly make use of, any customer lists or other confidential information with respect to the business and affairs of Premier obtained by [them] during the period of relationship between the parties."

73.     Defendants Tony Tellez and TKL further agreed in Section 8 of Tony's Separation Agreement that they "understood and agreed that such confidential information shall remain solely the property of Premier" and agreed to "take reasonable precautions to prevent disclosure of such information."

74.     In addition, Defendants Tony Tellez and TKL agreed in Section 10 of Tony's Separation Agreement to "[c]ontinuing obligations" to "not, without the prior written consent of Premier, use any such [confidential] information for [their] personal benefit" or "disclose

[confidential information] to any third party unless such information had been previously disclosed publicly by [Premier] or is required to be disclosed by law."

75.     Section 3(a) of Tony's Separation Agreement provides that "Should [Tony Tellez] breach or violate any of the terms and conditions of the Agreement, [he] will be required to promptly return any commissions and severance pay that has been paid to [him] pursuant to this Agreement." This provision applies to Defendant TKL as well. Tony Tellez received "Separation Benefits" amounting to $150,000.

76.     In Section 11 of Tony's Separation Agreement, Defendants Tony Tellez and TKL agreed that that "the remedy at law for any breach of [Sections 8 and 10] will be inadequate" and that Premier is "entitled to injunctive relief . . . in addition to any other remedies [it] may have at law, in equity, by statute or otherwise."

77.     Section 12(h) of Tony's Separation Agreement provides that Premier is "entitled to all legal fees and costs incurred as a result" of Defendants Tony Tellez and TKL's actions in "default under any of the obligations of the agreement."

78.     In connection with creating, developing, operating and assisting Evolution, Defendants Tony Tellez and TKL have used and disclosed Premier confidential information without Premier's prior written consent, and Premier is entitled to full monetary and injunctive relief as is specified in Tony's Separation Agreement.

## III.     EVOLUTION STORE FIXTURES

79.     Defendants began planning, operating, developing and assisting Evolution at least as of October 2015.

80.     On October 11, 2015, Defendants arranged to have a third party register two URL domains for Evolution, one for www.evolutionfixtures.com and the other for www.evolutionstorefixtures.com. The former is currently in use.

81.     Defendant Tony Tellez registered Evolution as a Florida limited liability company on January 27, 2016. Defendant Tony Tellez's LinkedIn page identifies him as Evolution's president since February 2016.

82.     Defendant Jose Tellez has been actively involved in efforts to obtain business for Evolution. For example, since the end of 2015, Jose sought business from major Premier customers, such as Dick's Sporting Goods.

83.     Defendant Paul Saudino's LinkedIn page states that he began working as Evolution's Vice President of Design and Engineering in June 2016. In reality, Mr. Saudino was working on and/or assisting Evolution in efforts to obtain business as early as April 2016, while he was still employed by Premier.

84.     Defendant Hank Mayors had extensive communications with Defendant Jose Tellez and others associated with Evolution during the first quarter of 2016 before abruptly resigning from Premier.  Mr. Mayors has worked on and/or assisted Evolution with its IT and other capabilities.

85.     Evolution leases 42,000 square feet of space at a warehouse in Jacksonville, Florida, 170 miles away from where Tony resides in St. Cloud, Florida. Evolution currently operates out of the Jacksonville space.

86.     Evolution's web site, LinkedIn Page and other on line marketing materials demonstrate that Defendants have organized Evolution for the purpose of pursuing Premier's customers based on Premier's intellectual property and other confidential and proprietary information.

87.     In its website's "About Us" page, Evolution describes the business as working "with global brands to develop merchandising solutions to meet their specific needs" in much the same way Premier aims to provide customer-specific fixtures work for global brands.

88.     Evolution admits that it is built off of Premier's expertise. The website explains that Evolution has assembled team members who have done store fixtures work for thirteen particular retailers, all of which are or have been Premier customers. The listed brands include some of Premier's most significant customers, such as Dick's Sporting Goods, Academy Sports, Phillips Van Heusen, American Eagle Outfitters, Nike and Target.

89.     Evolution's web site, LinkedIn Page and other on line marketing materials contain photographs and drawings used by Premier in connection with customer projects. And Evolution's Facebook profile has even featured a "Project of the Week" that was in Premier's work for Footlocker's "House of Hoops."

90.     Based on information supplied by Premier's customers and vendors as well as the Company's own independent investigation, Premier has learned that the Defendants have engaged in various misappropriation act on behalf of Evolution and that Defendants Jose Tellez, Tony Tellez and TKL have flagrantly breached confidentiality restrictions and other restrictive covenant agreements with Premier.

## IV.     DEFENDANTS' MISAPPROPRIATION OF PREMIER'S TRADE SECRETS

91.     At least since April of 2016 and continuing until the present, Defendants have used and disclosed confidential Premier drawings and designs as well as other proprietary Premier information for Evolution's benefit.

### A.     Defendants' Misappropriation of the Ball Holder Specs

92.     Between April and June 2016, Defendants used and disclosed trade secret information in the form of Premier's drawings, designs and specifications for a set of ball holder

-18-

fixtures (the "Ball Holder Specs") in order to replace Premier as a provider of ball holder fixtures to Dick's Sporting Goods.

### 1. The Ball Holder Specs

93.     In 2014, Premier began designing, engineering, producing, supplying, delivering and outfitting Dick's Sporting Goods, Premier's largest customer, with metal ball holder fixtures.

94.     On March 27, 2014, Premier engineer, Jeremy Conlon, conceived, authored, designed and drew the nine pages the "Ball Holder Specs. Each of the nine pages of Ball Holder Specs shows in the "author" box the initials "JDC," referring to Mr. Conlon. And the metadata for the document identifies the "author" as "JConlon."

95.     Each page of the Ball Holder Specs is also stamped with Premier's trade dress logo.

96.     Each page of the Ball Holder Specs is further identified by the Premier part number "DSG-MBHLDR."

97.     And perhaps most significantly, each of the nine pages of the Ball Holder Specs contains a legend, warning: **"This drawing and design are the intellectual property of Premier Store Fixtures, Inc. Any reproduction or alteration without written permission from PSF is prohibited."**

98.     The Ball Holder Specs were approved by Defendant Jose Tellez on April 24, 2014 (at a time when Mr. Tellez was still Premier's senior executive). The first page of the Ball Holder Specs' final version is stamped in the top right hand corner: "Approved by Jose Tellez at 2:18 p.m. Apr. 24, 2014."

99.     The Ball Holder Specs are Premier trade secrets because they contain the Company's protected and valuable confidential and proprietary information.

100. Premier invested time, effort, skill and expertise in creating, developing and using the Ball Holder Specs. Premier's engineer, Jeremy Conlon, authored, calculated, drew and designed the Ball Holder Specs to comply with Dike's exact specifications and directions so that Premier could produce customized ball holder fixtures.

101. The Ball Holder Specs themselves confirm that they are Premier's intellectual property insofar as each page is stamped with Premier's trade dress logo and contains the express statement that the designs and drawings are Premier's intellectual property.

102. Premier derives economic value from protecting trade secrets such as the Ball Holder Specs. Premier seeks to create the best and necessary fixtures to meet a particular client's needs. It invests in doing so in order to win business for Premier's economic advantage. It maintains the secrecy of the designs, drawings and other documents associated with these fixtures so that it safeguards this economic advantage, precluding other competitors, for example, from exploiting Premier's skill, ingenuity, business acumen and other expertise for their benefit and to Premier's detriment.

103. In 2014, Premier shared with Dick's "Top Level Drawings" of the Ball Holder Specs. These Top Level Drawings contain only the information comprised within the first three pages of the Ball Holder Specs. Premier has not shared – and would not share, as a matter of Company policy – with Dick's (or any other customer) the full 9 pages containing the comprehensive set of designs, drawings and specifications.

104. Premier designed, supplied, delivered and outfitted Dick's stores with ball holder fixtures in both 2014 and 2015.

105. Toward the end of March 2016, Dick's contacted Premier with a request to produce and provide Dick's 665 stores with 16 ball holder fixtures for each store. This year,

however, Dick's asked Premier to affix the Wilson Sporting Goods logo on the base of the fixtures. Dick's sought to have Premier produce and deliver these ball holder fixtures by the week of June 13, 2016.

106. On Monday morning, April 11, 2016, Premier provided Dick's with pricing for 11,000 ball holder fixtures containing the Wilson logo as identified by the Premier part number DSG-MBHLDR-G.

107. Later in April 2016, Dick's informed Premier that it would not need the Company's services this year to produce the ball holder fixtures.

### 2. Defendants' Improper Use and Disclosure of the Premier's Ball Holder Specs

108. Between April and June 2016, Defendants improperly used and disclosed to third parties Premier's Ball Holder Specs so that Evolution could perform the ball fixtures business for Dick's in 2016.

109. Xiamen Mavis Display Fixtures Co., Ltd. ("Mavis"), one of Premier's Chinese vendors, has now shared with Premier an email (the "Mavis Email") it received from Evolution at 8:16 a.m. on April 12, 2016, attaching an RFQ as well as a full set of Premier's Ball Holder Specs. It is unclear whether the email time refers to China time or East Coast U.S. time.

110. The Mavis Email stated: "Attached please find our RFQ #10002 along with drawing of the item. The finish is P-7 Glimmer on your B95161 (JINGYUAN). Also, customer has requested Silk Screen Logo per sample below to be imprinted on sign holder channel as shown on page 9 of the attached drawing." The Wilson Sporting Goods logo of a lowercase script "w" on red background appears at the end of the email.

111. In the Mavis Email, Evolution indicates that it is seeking quotes for a vendor to assist it in producing ball holder fixtures based on the Ball Holder Specs. Evolution asked that the fixtures be shipped back to the United States by late May 2016.

112. The attached RFQ shows that Evolution was seeking quotes from vendors to produce a fixture that was designed and engineered by Premier. The RFQ refers and relates to a Premier part number.

113. The Mavis Email purports to be from Defendant Tony Tellez but there is strong reason to believe it was sent by Defendant Jose Tellez. The email sender used an email address of jatellez@evolutionfixtures.com, corresponding to the name "Jose A. Tellez." He sent it to two Mavis employees but copied the email as well to ttellez@evolutionfixtures.com, corresponding to the name "Tony Tellez." Other Evolution documents and Tony Tellez's LinkedIn profile show Tony only uses the latter as his work email address, not the former. Moreover there would be no need for Tony Tellez to have and use two separate work email addresses.

114. Even more significantly, metadata of the Ball Holder Specs PDFs attached to the Mavis Email shows that, shortly after 8 p.m. on April 11, 2016, "JTellez" altered the ninth and last page of the Ball Holder Specs by using a design application to insert in the Wilson logo and to construct arrows identifying the logo's specifications and silk screen surrounding.

115. Defendants Jose Tellez and Tony Tellez, however, were not the only defendants involved in misappropriation acts with respect to the Ball Holder Specs. Late in the evening of April 11 (or early morning April 12, depending on the applicable time zone), Defendant Paul Saudino forwarded four documents from work email address of psaudino@premierfixtures.com

-22-

to PaulSaudino@gmail.com. Two of the four were PDFs showing designs of the ball holder fixtures. The other two related to the Wilson Sporting Goods' logo.

116.    At the time Defendant Paul Saudino forwarded these PDFs about the ball holder fixtures to his personal gmail account, he was a Premier employee and subject to Premier policies prohibiting email usage to expropriate trade secrets or benefit a competitor.

117.    Later in the morning on April 12, Saudino also created two shortcut links on his desktop allowing him to access those filed through personal folders on his D Drive. These link files were labeled "DSG-MBHLDR-Wilson.psd" and "DSG-MBHLDR-Wilson2.psd." The "psd" application refers to "Photoshop," which is the application that Defendant Jose Tellez used to insert the Wilson logo and other items onto the ninth page of Premier's Ball Holder Specs.

118.    Defendant Paul Saudino was not a part of and had no responsibility for the Dick's account at Premier. Nor had anyone on Premier's Dick's account client team done any work on collecting or preparing materials for modifying the Ball Holder Specs with Wilson logo information.

119.    Premier has compared the metadata "properties" recorded in the final version of the Ball Holder Specs in its computer system with the version attached to the Mavis Email. The comparison further confirms that Evolution was using a Premier document. Both documents show a record creation date of 4/14/2014 at 3:23:25 p.m. Premier's final approved version, however, has a last modified date of 4/24/2014 while the version Defendants attached to the Mavis Email show a last modified date of 4/11/2016 at 8:02:56 p.m. The original author recorded in both is Premier's Jeremy Conlon.

120.    It is apparent that Defendants sent the Ball Holder Specs to other vendors as well, inasmuch as Mavis was not the vendor that produced the ball holder fixtures between April and

June 2016. Import records confirm that a different company, Xiamen Constant ("Constant") Imp. & Exp. Trade Co. produced the fixtures and delivered them to the Port of Long Beach in Southern California on June 5, 2016.

121. Later in June 2016, Evolution arranged for the ball holder fixtures to be delivered to all Dick's stores and, thereafter, received payment for the project.

122. In short, between April and June 2016, Defendants committed various acts of misappropriation including improper usage and disclosure of Premier trade secrets. By expropriating and altering Premier's designs and drawings for their own use, Defendants did not need to invest in their own designs and drawings and were able to exploit Premier's customer goodwill with Dick's Sporting Goods for their own benefit.

**B.** **Defendants' Other Misappropriation Conduct**

123. During the first half of 2016 and continuing to the present, Defendants have engaged in other misappropriation acts.

124. Premier has now learned from several customers in addition to Dick's that Defendants have been, and are currently, using Premier's confidential and proprietary information in soliciting business from these customers.

125. At the very least, Defendants Jose Tellez and Tony Tellez have made these efforts with Premier customers, such as Phillips Van Heusen and Academy Sports.

126. Defendants Hank Mayors and Paul Saudino have also been engaged in other acts of misappropriation.

127. For example, on Thursday March 31, 2016, Defendant Hank Mayors shared with Defendant Paul Saudino internal Premier information about Stafford Computer Associates ("Stafford"), the company that hosts Premier's servers. Mayors shared with Saudino Stafford's Hosting Services Agreement with Premier and other information including pricing information.

128.    As a Premier engineer working on design projects for customer accounts, Defendant Paul Saudino had no involvement with Premier's back office service work. In particular, he had no involvement with Premier's arrangement with and use of Stafford's computer hosting services.

129.    Stafford, however, was a company that Defendant Jose Tellez had contracted to work for Premier. In 2006, Jose Tellez hired Stafford's Hank Mayors to work at Premier as the Company's head IT person.

130.    Notwithstanding explicit prohibitions in the Consulting Agreement forbidding communications with Premier employees, during the first quarter of 2016, Defendant Jose Tellez had extensive communications with Hank Mayors including over 150 minutes of phone conversations at the end of February and first weeks of March 2016. Defendant Jose Tellez had these conversations with Hank Mayors even though he had already received a written notice that he could lose all payments under his Consulting Agreement if he continued to communicate with Premier employees without authorization.

131.    On Saturday, April 2, 2016, only two days after sharing Premier's Stafford information with Saudino, Mayors had phone communication with someone at Evolution's offices in Jacksonville. That same day Evolution shifted the hosting of its website to Stafford even though Stafford is located in Setauket, Long Island, thousands of miles away from Florida.

132.    Less than a week later, on the morning of Friday, April 8, 2016, Mayors unexpectedly resigned from Premier, claiming only unspecified "personality conflicts."

133.    As the head of IT at Premier and its liaison with Stafford, Mayors had information enabling access to Premier's computer system including its proprietary and confidential

information even after leaving Premier. He continued to have the ability to access Premier's computer system without authorizatrion even after his resignation.

134. On or about Thursday July 7, 2016, after learning about Premier's investigation of Defendants' misconduct, Defendants shifted the hosting of its current web site away from Stafford to a different company.

135. In sum, since at least April 2016, Defendants have engaged in various improper misappropriation acts in which they have expropriated, disclosed and/or used internal Premier information including trade secrets, such as designs, drawings, contracts, pricing and other customer information. Premier is entitled to all monetary and injunctive relief for Defendants misappropriation and other related misconduct.

## V.   DEFENDANT JOSE TELLEZ'S BRECHES OF NON-COMPETITION AND NON-SOLLICITATION RESTRICTIONS

136. In addition to his confidentiality obligations, Defendant Jose Tellez agreed in both the APA and the Consulting Agreement to specific restrictive covenants prohibiting non-competition and non-solicitation of customers, vendors and employees. He has materially breached those restrictions and Premier is entitled to recover all compensatory and consequential damages, recoup monies paid and receive full injunctive protections.

### A.   Jose Tellez's Non-Compétition and Non-Sollicitation Obligations

137. Pursuant to the APA and the Consulting Agreement, Defendant Jose Tellez entered into Non-Competition and Non-Solicitation agreements that were to last through, at least, October 31, 2018.

138. The APA provides that these restrictions were "a material inducement to [Premier]'s acquisition of [the Asset Purchase] Transaction[] including [Premier']s acquisition of the Goodwill." The APA defines "Goodwill" to "mean[]: (a) the expectation of continued from

-26-

Customers of the [Premier Inc.] and new patronage from prospective Customers of [Premier Inc.]; and (b) the Business as a going concern and all of the goodwill incident to the Business."

139.    Likewise, the Consulting Agreement provides that any paid compensation was "[i]n exchange for the satisfactory performance of all Services rendered" and that Defendant Jose Tellez "shall be bound by and abide by the terms of contained in the . . . Restrictive Covenant Agreement."

### 1.    The Non-Competition Restrictions

140.    In the APA's Section 10.2(b), Defendant Jose Tellez agreed that he would not "directly or indirectly . . . without the prior written Consent of P[remier] . . . (i) participate or engage in, or offer any services related to any lines of business which comprise the Business . . . or (ii) become an owner, stockholder, member, lender, partner, co- venturer, director, manager, officer, employee, agent or consultant (an "Interested Person"), directly or indirectly, in any Person that engages in the Restricted Business."

141.    Similarly, in Section 4(b) of his Restrictive Covenant Agreement, attached as Exhibit 2 to the Consulting Agreement, Defendant Jose Tellez agreed to a Non-Competition provision that states in pertinent part:

> During my service with the Company and for [two years thereafter], I shall not, directly or indirectly, for my own benefit or for the benefit of any third party, in any capacity (as a principal, shareholder, partner, director, officer, agent, executive, consultant, contractor, employee, lender or otherwise), engage or participate in, or be financially interested in, (i) any Person involved in the Business . . . or (ii) any business that uses or relies on any Confidential Information.

142.    Defendant Jose Tellez has engaged in various breaches of these non-competition restrictions through his active assistance and involvement with the creation, development and operation of Evolution.

## 2.     The Non-Solicitation Restrictions

143.    Pursuant to APA Section 10.2(a), Defendant Jose Tellez agreed to various "non-solicitation" and "non-acceptance" that apply to direct or indirect communications with Premier's customers, vendors or employees.

144.    Specifically, Defendant Jose Tellez is compelled by the APA not to:

(1)    "solicit, accept, call on, divert, take away, influence, induce, or attempt to do any of the foregoing . . . or attempt to induce any such Customer . . . to cease doing business, reduce or otherwise, limits its business with P[remier]."

(2)    "solicit, direct or influence any of the suppliers, vendors, service providers, personnel and others having business relations with" Premier Inc. as of October 31, 2013 "or attempt to do any of the foregoing, for the purpose or with the effect of  causing any thereof to cease doing business, reduce or otherwise limit its business with [Premier]."

(3)    "solicit, call on, divert, influence, induce or attempt to do any of the foregoing with respect to any employee or independent contractor of" Premier Inc. as of October 31, 2013 that was "subsequently employed by or engaged by [Premier] . . . to leave the employ or engagement of [Premier]."

(4)    "hire or attempt to hire any employee or independent contractor of" Premier Inc. as of October 31, 2013 that was "subsequently employed or engaged by [Premier]."

(5)    "attempt to influence or induce any such employee or independent contractor to terminate or modify any Contract , arrangement or relationship with [Premier]."

145.    Moreover, in addition to categorical restraints barring communications with Premier's customers, vendors and employees that are stated in Exhibit 1 to the Consulting Agreement, the Restrictive Covenant Agreement that was attached as Exhibit 2 to the Consulting Agreement contains specific non-solicitation restrictions.

146.    These non-solicitation restrictions are specified in Section 4 of the Consulting Agreement and are applicable throughout the term of Jose Tellez's consultancy and for a two year post-consultancy restriction period.

147.    The Section 4 non-solicitation restrictions prohibit Defendant Jose Tellez from "directly or indirectly" and "for [his] own benefit or for the benefit of any third party" doing the following:

(1)    "inducing, soliciting, recruiting, or attempting to persuade Premier employees to "terminate such Person's employment or other relationship with [Premier] or not to establish an employment or other relationship with [Premier]."

(2)    "establishing, attempting to establish or encouraging or assisting others to establishing "a business relationship with, any individual who was an employee, consultant, contractor, officer or director of the Company during the twelve month period preceding the first day of the [two year] Restricted Non-Solicit Period."

(3)    "directing or engaging in acts interfering with or adversely affecting, altering or changing Premier's relationship with a "Customers, Prospective Customer, vendor, supplier or contractor of [Premier].

(4)    "inducing or attempting to induce and "Person to cease doing business, reduce or otherwise limit its business with [Premier]."

(5)    "solicit[ing] business from any Customer or Prospective Customer, or do[ing] business with any Customer, Prospective Customer of [Premier], involving the Business."

148.    The Consulting Agreement defines Premier's "Business" to "mean[] any business that engages in the design manufacture or supply of merchandising displays, fixtures and related accessories for use in retail or store environments . . . [any]where in the world where the Company does business."

149.    Defendant Jose Tellez affirmed in Section 9 of the Restrictive Covenant Agreement that: "I further acknowledge and agree that if I breach Section[] . . . 4 . . .of this [Restrictive Covenant] Agreement in any respect, the restrictions contained in th[at] Section[] will be extended for a period equal to the period that I was in breach."

-29-

150.     In connection with creating, developing and operating Evolution, Defendant Jose Tellez has violated the non-competition and non-solicitation restrictions in Section 4 of the Restrictive Covenant Agreement.

**B.      Jose Tellez's Solicitation of Premier's Customers and Employees**

151.     During at least the last seven months, Defendant Jose Tellez has solicited Premier's customers and employees in breach of his non-competition and non-solicitation obligations.

**1.      Jose Tellez's Soliciting of Premier's Customers**

152.     Defendant Jose Tellez and others associated with Evolution have communicated with and sought business from Premier customers, including among others, Dick's Sporting Goods, Phillips Van Heusen and Academy Sports.

153.     For example, starting at the end of 2015 and throughout the first half of 2016, Defendant Jose Tellez engaged in several communications with Dick's Sporting Goods about Dick's doing business with Evolution.

154.     Dick's Senior Director of Purchasing estimates that he alone had seven to ten phone conversations with Defendant Jose Tellez in which Jose Tellez sought work for Evolution.

155.     When Dick's Senior Director of Purchasing asked Defendant Jose Tellez whether he could be communicating with Dick's in light of his consultancy arrangement with Premier, Jose rationalized that he was making the requests on behalf of his brother Tony Tellez. This response by Defendant Jose Tellez is an admission that he has violated both his non-competition and not-solicitation restrictions with Premier.

156.     As a result of his communications with Dick's Senior Director of Purchasing, Defendant Jose Tellez arranged for Evolution to submit paperwork to Dick's Procurement Department for the purpose of becoming qualified as a Dick's provider.

157. Defendant Jose Tellez's communications with Dick's resulted in Evolution replacing Premier as Dick's provider of ball holder fixtures in 2016.

158. Other Premier customers report that Defendant Jose Tellez has sought business from them on behalf of Evolution.

### 2. Jose Tellez's Soliciting and Hiring Premier Employees

159. Premier has learned that Defendant Jose Tellez communicated with and/or solicited, hired or attempted to hire Premier employees to work at or otherwise assist Evolution.

160. During the first quarter of 2016, Defendant Jose Tellez extensively communicated with Defendant Hank Mayors in direct violation of Exhibit 1 to the Consulting Agreement.

161. Defendant Jose Tellez also solicited and/or participated in efforts to hire Defendant Paul Saudino to work for Evolution. Saudino resigned from Premier in late May 2016. He told Premier only that he would be returning to his "old company." By the beginning of June 2016, Saudino's LinkedIn profile showed that he had become a Vice President at Evolution, where he reunited with old colleagues.

162. During the week of June 6, 2016, Defendant Jose Tellez met with three Premier employees in New York to discuss working with Evolution. These employees are Luis Alvarez, Hugo Roman and Gabriel Serna. Defendant Jose Tellez has also sought to discuss Evolution with other Premier employees as well.

163. In short, Defendant Jose Tellez materially breached the APA and the Consulting Agreement through his communications with and solicitations of Premier customers and employees on behalf of Evolution.

<u>**COUNT I**</u>
<u>(**Defend Trade Secrets Act (18 U.S.C. § 1836 as Amended**)</u>
<u>(**Against all Defendants**)</u>

164.    Premier realleges and incorporates all previous allegations set forth in Paragraphs 1-163 above as if fully set forth herein.

165.    Premier sells and operates its store fixtures business, products and services in interstate and foreign commerce, transacting and doing business with customers, vendors and others throughout the United States and internationally.

166.    Premier conceives, designs, develops and transacts business relating to trade secrets as that term is defined under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b), as amended (the "DTSA"), to include, among others, all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing.

167.    Among other information, Premier's trade secrets encompass Premier's confidential and proprietary intellectual property such as designs, drawings, specifications, customer-specific products, services, techniques, and programs as well as financial, business, economic and other forms of customer goodwill associated with its customers, prospective customers and vendor relationships.

168.    Premier has and continues to derive actual and potential economic value from its trade secrets not being generally known or readily ascertainable through proper means by

another person or entity who could obtain economic value from the disclosure or use of the information.

169. Premier has and continues to derive economic value from its trade secrets though hard work and dedication in which it has devoted substantial resources, time and investment to creating, developing and using such information.

170. As is detailed in the foregoing allegations, Premier has taken reasonable steps and precautions to safeguard, limit and restrict others outside of Premier from knowing, readily ascertaining or using its trade secrets.

171. Defendants have willfully and maliciously engaged in various misappropriation acts regarding Premier's trade secrets, including but not limited to the improper expropriation, disclosure and use of the Ball Holders Specs for the purpose of producing and delivering ball holder fixtures to Dick's Sporting Goods stores in June 2016.

172. Defendants have engaged and continue to engage in additional willful and malicious misappropriation of Premier's trade secrets, including, but not limited to, the improper use and disclosure of Premier's confidential and proprietary information in soliciting business for Evolution from Premier customers and vendors.

173. Defendants have engaged and continue to engage in additional willful and malicious misappropriation of Premier's trade secrets, including, but not limited to, the improper use and disclosure of Premier's other confidential and proprietary intellectual property and information such as financial, technological, business and customer related documents and data.

174. As a result of Defendants' improper expropriation, disclosure and use of Premier's trade secrets, Defendants have violated the DTSA.

175.    As a direct and proximate result of Defendants' violations of the DTSA, Premier is entitled to full compensatory and consequential damages, as well as full attorneys' fees, costs and expenses.

176.    Because Defendants' DTSA violations have been willful and malicious, Premier is entitled to exemplary damages of more than twice the amount of damages for any actual loss and any unjust enrichment.

177.    Defendants' DTSA violations have caused and will continue to cause Premier irreparable harms that are not adequately remedied at law and that require preliminary and permanent injunctive relief.

**COUNT II**
**(Misappropriation of Premier Proprietary and Confidential Information)**
**(Against All Defendants)**

178.    Premier realleges and incorporates all previous allegations set forth in Paragraphs 1-177 above as if fully set forth herein.

179.    Premier's trade secrets encompass Premier's confidential and proprietary intellectual property such as designs, drawings, specifications, customer-specific products, services, techniques, and programs as well as financial, business, economic and other forms of customer goodwill associated with its customers, prospective customers and vendor relationships.

180.    Premier has and continues to derive actual or potential economic value from its trade secrets not being generally known or readily ascertainable through proper means by another person or entity who could obtain economic value from the disclosure or use of the information.

181.   Premier has and continues to derive economic value from its trade secrets though hard work and dedication in which it has devoted substantial resources, time and investment to creating, developing and using such information.

182.   As is detailed in the foregoing allegations, Premier has taken reasonable steps and precautions to safeguard, limit and restrict others outside of Premier from knowing, readily ascertaining or using its trade secrets.

183.   Defendants have willfully and maliciously engaged in various misappropriation acts regarding Premier's trade secrets, including but not limited to, the improper expropriation, disclosure and use of the Ball Holders Specs for the purpose of producing and delivering ball holder fixtures to Dick's Sporting Goods stores in June 2016.

184.   Defendants have engaged and continue to engage in additional willful and malicious misappropriation of Premier's trade secrets, including but not limited to, the improper use and disclosure of Premier's confidential and proprietary information in soliciting business for Evolution from Premier customers and vendors.

185.   Defendants have engaged and continue to engage in additional willful and malicious misappropriation of Premier's trade secrets including but not limited to the improper use and disclosure of Premier's other confidential and proprietary intellectual property and information such as financial, technological, business and customer related documents and data.

186.   As a result of Defendants' improper expropriation, disclosure and use of Premier's trade secrets, Defendants have violated New York misappropriation law.

187.   As a direct and proximate result of Defendants' violations of New York misappropriation law, Premier is entitled to full compensatory and consequential damages, as well as full attorneys' fees, costs and expenses.

188.   Defendants' misappropriation has caused and will continue to cause Premier irreparable harms that are not adequately remedied at law and that require preliminary and permanent injunctive relief preventing actual, continued or threatened misappropriation of Premier's trade secrets.

**COUNT III**
**(Unfair Competition)**
**(Against All Defendants)**

189.   Premier realleges and incorporates all previous allegations set forth in Paragraphs 1-188 above as if fully set forth herein.

190.   Premier's trade secrets and/or internal property include, among others, designs, drawings, specifications, customer-specific products, services, techniques, and programs as well as financial, business, economic and other forms of customer goodwill associated with its customers, prospective customers and vendor relationships.

191.   Defendants have willfully and maliciously engaged in various misappropriation acts regarding Premier's trade secrets and/or internal property, including but not limited to, the improper expropriation, disclosure and use of the Ball Holders Specs for the purpose of producing and delivering ball holder fixtures to Dick's Sporting Goods stores in June 2016.

192.   Defendants have engaged and continue to engage in additional willful and malicious misappropriation of Premier's trade secrets and/or internal property, including but not limited to, the improper use and disclosure of Premier's confidential and proprietary information in soliciting business for Evolution from Premier customers and vendors.

193.   Defendants have engaged and continue to engage in additional willful and malicious misappropriation of Premier's trade secrets and/or internal property, including but not

limited to, the improper use and disclosure of Premier's intellectual property and other information such as financial, technological, business and customer related documents and data.

194.    Defendants benefited from their misappropriation of Premier's trade secrets and/or internal documents and information by seeking and obtaining business from Premier's customers and vendors.

195.    As a result of Defendants' improper expropriation, disclosure and use of Premier's trade secrets and/or internal documents and information for Evolution's benefit, Defendants have engaged in unfair competition.

196.    As a direct and proximate result of Defendants' actions, Premier is entitled to full compensatory and consequential damages, as well as full attorneys' fees, costs and expense.

197.    Defendants' unfair competition caused and will continue to cause Premier irreparable harm that is not adequately remedied at law and that requires preliminary and permanent injunctive relief.

### COUNT IV
### (Tortious Interference With Business Relations)
### (Against All Defendants)

198.    Premier realleges and incorporates all previous allegations set forth in Paragraphs 1-197 above as if fully set forth herein.

199.    Premier had and has business relations with third parties such as customers and vendors.

200.    Premier had and has expectations of continued business with these customers and vendors, including but not limited to, the expectation of preparing ball holder fixtures for Dick's Sporting Goods.

201. Defendants had knowledge of these business relations, including but not limited to, Premier's business relations with Dick's Sporting Goods and Premier's preparation of ball holder fixtures for Dick's in 2014 and 2015.

202. Defendants have intentionally and willfully interfered with Premier's business relations, including but not limited to, the business relations with Dick's Sporting Goods, by seeking work from Premier's vendors and customers, including Dick's, on behalf of Evolution. Defendants have succeeded in obtaining work from Premier's vendors and customers, including but not limited to obtaining work from Dick's on behalf of Evolution.

203. But for Defendants' intentional interference with Premier's business relations with Premier's vendors and customers, Premier would have obtained the expected business, including but not limited to, the work preparing ball holder fixtures for Dick's.

204. Defendants have acted for a wrongful purpose and used dishonest, unfair, and improper means in seeking and obtaining this work from Premier's customers by, among other actions, bidding on this work using Premier trade secrets and/or other internal information.

205. Defendants also acted solely for the purpose of harming Premier, because they have knowledge of Premier's business and pricing strategies and knew that bidding on such work at a lower price than Premier would cause Premier to lose the business it expected.

206. As a direct and proximate result of Defendants' actions, Defendant have tortiously interfered with Premier's business relations and business expectations.

207. As a direct and proximate result of Defendants' tortious interference with Premier's business relations and business expectations, Premier has sustained compensatory and consequential damages, including but not limited to, losses associated with the loss of the ball holder fixture work for Dick's.

-38-

208. Premier is also entitled to attorneys' fees and exemplary damages resulting from Defendants' misconduct.

209. Premier has suffered irreparable harm that is not adequately remedied at law and Defendants must be enjoined from further tortious interference with Premier's business relations and business expectations.

**COUNT V**
**(Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq.)**
**(Against All Defendants)**

210. Premier realleges and incorporates the allegations set forth in Paragraphs 1-209 above as if fully set forth herein.

211. Premier's computers are used for the purpose of interstate and foreign commerce and communication and are protected computers under 18 U.S.C. § 1030(e)(2).

212. Defendants knowingly, willfully and with intent to defraud, accessed Premier's computers without authorization or in excess of authorization for the purpose of seeking to obtain valuable information to be used for Evolution's benefit.

213. After gaining unauthorized access to Premier's servers, Defendants obtained and used valuable information from Premier's protected computers in transactions involving interstate and foreign communications. This information included Premier's trade secrets such as Premier's confidential and proprietary intellectual property, customer-related information and financial information.

214. Premier has been damaged by Defendants' actions during a one-year period far in excess of $5,000, including being forced to expend resources to investigate unauthorized access and abuse of its computer network. Premier seeks all compensatory, consequential and exemplary damages including attorneys' fees and all other relief under 18 U.S.C. § 1030(g).

215.    Premier has suffered irreparable harm that is not adequately remedied at law and Defendants must be enjoined from further unauthorized use of Premier's protected computers.

**COUNT VI**
**(Breach of Contract: Asset Purchase Agreement)**
**(Against Defendant Jose Tellez)**

216.    Premier realleges and incorporates all previous allegations set forth in Paragraphs 1-215 above as if fully set forth herein.

217.    Defendant Jose Tellez freely and voluntarily entered into, signed and executed the binding and enforceable APA both as President of Premier Fixtures, Inc. and as one of Premier Fixtures, Inc. stockholders.

218.    Premier Fixtures, LLC has fully performed its obligations under the APA, including paying Jose Tellez over $5 million and the granting him equity membership units in Premier Fixtures, LLC that ultimately resulted in Jose Tellez receiving an additional $8.6 million.

219.    As has been detailed in foregoing allegations, pursuant to Article X of the APA, Jose Tellez agreed to various restrictions lasting through October 31, 2018 regarding the use and disclosure of Premier's confidential information, the solicitation of and other interactions with Premier's customers, suppliers, vendors, providers, employees or independent contractors and any direct or indirect competition with Premier.

220.    Defendant Jose Tellez has materially breached and is continuing to materially breach various provisions of Article X and other sections of the APA.

221.    As a direct and proximate result of Defendant Jose Tellez's material breaches of the APA, Premier has incurred compensatory and consequential damages. Premier is also

entitled to recoupment of all monies paid to Jose Tellez as well as all monetary and injunctive relief for these violations.

## COUNT VII
### (Breach of Contract: Consulting Agreement)
### (Against Defendant Jose Tellez)

222. Premier realleges and incorporates all previous allegations set forth in Paragraphs 1-221 above as if fully set forth herein.

223. On July 17, 2014, Defendant Jose Tellez freely and voluntarily entered into Jose's Separation Agreement, which is a valid and enforceable contract. The Separation Agreement included a "Consulting Agreement" with Premier Fixtures, LLC that was attached to Jose's Separation Agreement. The Consulting Agreement is a valid and enforceable contract.

224. The Consulting Agreement contained two exhibits including a Restrictive Covenant Agreement that imposed valid and enforceable contractual obligations upon Defendant Jose Tellez.

225. At all relevant times, Premier has fully performed its obligations under Jose's Separation Agreement and the Consulting Agreement, including all exhibits.

226. As is described in more detail in the foregoing allegations, Defendant Jose Tellez agreed in Exhibit 1 to the Consulting Agreement not to contact or engage in discussions with Premier employees, customer or vendors unless he received written approval from Premier.

227. As is described in more detail in the foregoing allegations, Defendant Jose Tellez agreed in Exhibit 2 to the Consulting Agreement (that is the Restrictive Covenant Agreement) to various restrictions on the use and disclosure of Confidential Information as well those pertaining to non-competition and non-solicitation of, among others, Premier's employees,

customers, prospective customers, vendors and suppliers during the time the Consultant Agreement is in existence and for at least a two-year period thereafter.

228. Defendant Jose Tellez has materially breached and is continuing to materially breach various provisions of the Consulting Agreement, including obligations set out in Exhibit 1 to that agreement and those set out in the Exhibit 2 Restrictive Covenant Agreement.

229. As a direct and proximate result of Defendant Jose Tellez materially breaching the Consulting Agreement. Premier has incurred substantial damages.

230. In Section 5 of the Jose's Separation Agreement, Defendant Jose Tellez agreed that if he "violates any provisions of the Restrictive Covenant Agreement . . . no further payments, rights or benefits" identified in an employment agreement he signed in October 2013 "will be due to [Jose Tellez]."

231. In Section 6(a) of his Restrictive Covenant Agreement, Defendant Jose Tellez agreed that Premier shall have broad rights to monetary and injunctive relief in the event of his breaches.

232. Premier is also entitled to recoupment of all monies paid to Jose Tellez under the Consulting Agreement as well as full compensatory and consequential damages.

233. Premier is entitled to full injunctive relief preventing actual, continued or threatened breaches by Defendant Jose Tellez of obligations set out in Exhibit 1 to the Consulting Agreement and in Exhibit 2 to the Consulting Agreement that is the Restrictive Covenant Agreement.

## COUNT VIII
### (Breach of Contract: Tony's Separation Agreement)
### (Against Defendant Tony Tellez and TKL Associates, Inc.)

234.     Premier realleges and incorporates all previous allegations set forth in Paragraphs 1-233 above as if fully set forth herein.

235.     On June 7, 2013, Tony Tellez, on behalf of himself and as president of Defendant TKL, voluntarily entered into Tony's Separation Agreement with Premier Fixtures, Inc., the predecessor to Premier Fixtures, LLC, terminating his employment relationship with Premier. Tony's Separation Agreement is a valid and enforceable contract.

236.     At all relevant times, Premier Fixtures, Inc. and Premier Fixtures, LLC have performed their obligations under Tony's Separation Agreement.

237.     As has been detailed in the foregoing allegations, Defendants Tony Tellez and TKL agreed in Tony's Separation Agreement in Section 8 to a covenant prohibiting non-disclosure of Premier's confidential information through June 3, 2016, and in Section 10 to a continuing obligations (always in effect) covenant prohibiting Defendants Tony Tellez and TKL Associates from disclosing or using Premier's confidential information "without the prior written consent of Premier."

238.     Defendants Jose Tellez and TKL have materially breached Section 8 and 10 of Tony's Separation Agreement.

239.     As a direct and proximate result of Defendants Jose Tellez and TKL materially breaching Tony's Separation Agreement, Premier has incurred substantial compensatory and consequential damages.  Premier is entitled to recover all such compensatory and consequential damages.

240.     Pursuant to Section 3(a) of Tony's Separation Agreement, Premier is entitled to recoupment and disgorgement of any monies paid pursuant to Tony's Separation Agreement.

241.     Under Section 12(h) of Tony's Separation Agreement, Premier is entitled to recover "all legal fees and costs incurred" because Defendants Tony Tellez and TKL have defaulted under their contractual obligations.

242.     Pursuant to Section 11 of Tony's Separation Agreement, Premier is also entitled to injunctive relief resulting from Defendants Tony Tellez and TKL's breaches.

**COUNT IX**
**(Tortious Interference with the APA and the Consulting Agreement)**
**(Against Defendants Tony Tellez, Paul Saudino and Hank Mayors )**

243.     Premier realleges and incorporates all previous allegations set forth in Paragraphs 1-242 above as if fully set forth herein.

244.     The APA and 2014 Consulting Agreement are valid and enforceable contracts between Jose Tellez and Premier.

245.     Defendants Tony Tellez, Paul Saudino and Hank Mayors – individually, collectively and/or as agents of each other – were aware of the APA and the Consulting Agreement and their terms, including, without limitation, the confidentiality, non-solicitation and non-compete provisions contained therein.

246.     As detailed in the foregoing allegations, Defendant Jose Tellez breached the APA and the Consulting Agreement by, among others: expropriating, using and distributing Premier confidential and proprietary information; soliciting Premier customers, prospective customers and vendors as well; providing services to Evolution; and by soliciting, hiring, attempting to hire and communicating with Premier employees for Evolution's benefit.

247. As is detailed in the foregoing allegations, Defendants Tony Tellez, Paul Saudino and Hank Mayors – separately, collectively and/or as agent of each other – actively and affirmatively took steps to induce or cause Jose Tellez to breach the APA and the Consulting Agreement including all attached exhibits and contractual obligations.

248. Defendants Tony Tellez, Paul Saudino and Hank Mayors had no legal rights to interfere with the APA and the Consulting Agreement and there is no justification for their conduct.

249. As a direct and proximate result of Defendants Tony Tellez, Paul Saudino and Hank Mayors' conduct, Defendant Jose Tellez breached the APA and the Consulting Agreement including all attached exhibits and contractual obligations.

250. As a direct and proximate result of Defendants Tony Tellez, Paul Saudino and/or Hank Mayors – individually, collectively and/or as agent of each other – tortiously interfering with Defendant Jose Tellez's contractual obligations, Premier has sustained compensatory and consequential damages including exemplary damages and all costs and attorneys' fees.

251. Premier is also entitled to all necessary injunctive relief resulting from Defendants Tony Tellez, Paul Saudino and/or Hank Mayors – individually, collectively and/or as agent of each other – tortiously interfering with Defendant Jose Tellez's contractual obligations.

## COUNT X
## (Tortious Interference with Contractual Relations – Tony's Separation Agreement)
## (Against Jose Tellez, Paul Saudino and Hank Mayors)

252.  Premier realleges and incorporates all previous allegations set forth in Paragraphs 1-251 above as if fully set forth herein.

253.  Tony's Separation Agreement is a valid and enforceable contract between Tony Tellez and TKL and Premier.

254.  Defendant Jose Tellez, Paul Saudino and Hank Mayors – individually, collectively and/or as agents of each other – were aware of Tony's Separation Agreement and its terms.

255.  As is detailed in the foregoing allegations, Defendants Tony Tellez and TKL breached Tony's Separation Agreement by, among other things, disclosing and using Premier's confidential and proprietary Information without written consent of Premier.

256.  As is detailed in the foregoing allegations, Defendants Jose Tellez, Paul Saudino and Hank Mayors – individually, collectively and/or as agents of each other -- actively and affirmatively took steps to induce or cause Tony Tellez and TKL to breach Tony's Separation Agreement.

257.  Defendants Jose Tellez, Paul Saudino and Hank Mayors had no legal rights to interfere with Tony's Separation Agreement and there is no justification for their conduct.

258.  As a direct and proximate result of Defendants Jose Tellez, Paul Saudino and Hank Mayors' conduct, Defendants Jose Tellez and TKL breached Tony's Separation Agreement.

259.  As a direct and proximate result of Defendants Jose Tellez, Paul Saudino and/or Hank Mayors – individually, collectively and/or as agent of each other – tortiously interfering

with Defendants Tony Tellez and TKL's contractual obligations, Premier has sustained compensatory and consequential damages including exemplary damages and all costs and attorneys' fees.

260.     Premier is also entitled to all necessary injunctive relief resulting from Defendants Jose Tellez, Paul Saudino and/or Hank Mayors – individually, collectively and/or as agent of each other – tortiously interfering with Defendants Tony Tellez and TKL's contractual obligations.

### COUNT XI
### (Accounting)
### (Against Defendant Jose Tellez)

261.     Premier realleges and incorporates all previous allegations set forth in Paragraphs 1-260 above as if fully set forth herein.

262.     On July 17, 2014, Defendant Jose Tellez freely and voluntarily and entered into a Consulting Agreement with Premier Fixtures, LLC. The Consulting Agreement is a valid and enforceable contract.

263.     As is described in more detail in the foregoing allegations, Defendant Jose Tellez agreed in Section 4 of the Restrictive Covenant Agreement to various restrictions on the use and disclosure of Confidential Information as well those pertaining to non-competition and non-solicitation of, among others, Premier's employees, customers, prospective customers, vendors and suppliers during the time the Consultant Agreement is in existence and for at least a two-year period thereafter.

264.     At all relevant times, Premier has fully performed its obligations under the Consulting Agreement, including the Restrictive Covenant Agreement.

265. Defendant Jose Tellez, however, has materially breached and is continuing to materially breach various provisions of the Consulting Agreement, including obligations set out in the Restrictive Covenant Agreement.

266. As a direct and proximate result of Defendant Jose Tellez materially breaching the Consulting Agreement, Premier has incurred substantial compensatory and consequential damages.

267. Sections 6(a) and 6(c) of the Restrictive Covenant Agreement give Premier the right to obtain an accounting of all compensation, profits, monies, accruals, increments or other benefits received by Defendant Jose Tellez stemming from his wrongful conduct and breaches of the Restrictive Covenant Agreement.

268. As a result of this accounting, Premier is entitled to recovery against Defendant Jose Tellez of all revenues, profits, monies, accruals, increments and other benefits which he improperly obtained, directly or indirectly, as a result of his breaches of the Restrictive Covenant Agreement.

## REQUEST FOR RELIEF

Premier respectfully requests that this Court enter judgment in Premier's favor, granting the following relief against the Defendants:

(a) issuing a preliminary and permanent injunction ordering Defendant Jose Tellez to cease and desist from assisting, administering, operating, participating, soliciting business, soliciting prospective employees on behalf of or in or in any way having anything to do Evolution Fixtures, LLC, which does business as Evolution Store Fixtures through at least October 31, 2018 and for a reasonable period thereafter;

(b) issuing a preliminary and permanent injunction requiring Defendant Jose Tellez to account for and return all proceeds, compensation, profits, monies, accruals, increments or other benefits received by Defendant Jose Tellez pursuant to the APA and the Consulting Agreement, including the Restrictive Covenant Agreement, as a result of his material breaches of those agreements;

(c) issuing a preliminary and permanent injunction restraining all Defendants and anyone associated with Evolution Fixtures, LLC, which does business as Evolution Store Fixtures, from acquiring, using and/or disclosing Premier's trade secrets and/or other internal Premier documents, data and/or information;

(d) issuing a preliminary and permanent injunction requiring any and/or all Defendants and/or anyone associated with Evolution Fixtures, LLC, which does business as Evolution Store Fixtures, to account for and return to Premier any and all Premier trade secrets and other Premier documents and/or data in their possession, custody or control, including any and all copies thereof;

(e) issuing a preliminary and permanent injunction requiring and and/or all Defendants and/or anyone associated with Evolution Fixtures, LLC, which does business as Evolution Store Fixtures, to refrain from unauthorized access and/or access in excess of authorization to any part of Premier's computer system;

(f) issuing a preliminary and permanent injunction requiring Defendant Jose Tellez to abide fully by the confidentiality, non-compete and non-solicitation provisions in the APA and the Consulting Agreement including the attached Restrictive Covenant Agreement;

(g) issuing a preliminary and permanent injunction requiring Defendants Tony Tellez and TKL to abide by the confidentiality provisions in Tony's Separation Agreement;

(h)      entering judgment in Premier's favor and awarding full compensatory and consequential damages to Premier and against any and/or all Defendants jointly and severally, in an amount to be determined at trial, factoring in all interest, costs and expenses;

(i)      awarding Premier recoupment of all proceeds, compensation, consulting fees, non-compete payments, incentive payments, severance payments, profits, earnings, monies, and/or other benefits that were unjustly obtained by and and/or all of the Defendants from Premier, factoring in all interest, costs and expenses;

(j)      awarding Premier exemplary and/or punitive damages in an amount that is more than double the full damages incurred by Premier;

(k)      awarding Premier its reasonable attorneys' fees and costs incurred in bringing and having to pursue this action; and

(l)      providing Premier with such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       July 18, 2016

Respectfully submitted,

**CROWELL & MORING LLP**

By: _____
     Daniel D. Edelman
     Elizabeth A. Figueira
     590 Madison Avenue
     New York, NY 10022
     (212) 223-4000
     dedelman@crowell.com

*Attorneys for Plaintiff Premier Fixtures, LLC*