UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                                         )

PREMIER FIXTURES, LLC,           )

                                         )   Case No. 2:16-cv-03975

                        *Plaintiff*,    )   (LDW)(AKT)

                                         )

               v.                      )

                                         )

EVOLUTION FIXTURES, LLC, JOSE L.   )
TELLEZ, J. ANTONIO TELLEZ,      )
TKL ASSOCIATES, INC. PAUL       )
SAUDINO and HARRY MAYORS,     )

                                         )

                    *Defendants*.   )

-------------------------------------------------------------- X

 

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF PREMIER FIXTURES, LLC'S MOTION FOR
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

 

**CROWELL & MORING LLP**
590 Madison Avenue
New York, NY  10022
(212) 223-4000
dedelman@crowell.com
*Attorneys for Plaintiff Premier Fixtures,
LLC*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................... 3

I.       PREMIER STORE FIXTURES ................................................................................. 3

II.      DEFENDANTS' CONFIDENTIALITY AND RESTRICTIVE COVENANTS
         AGREEMENTS........................................................................................................ 5

         A.       Jose Tellez............................................................................................... 5

                  1.       APA Restrictions ........................................................................... 5

                  2.       Consulting Agreement Restrictions .............................................. 6

         B.       Tony Tellez and TKL Associates ............................................................. 8

III.     DEFENDANTS' MISCONDUCT................................................................................ 8

ARGUMENT ...................................................................................................................... 13

I.       PREMIER HAS SUFFERED IRREPARABLE HARM.............................................. 13

         A.       Defendants Admit Irreparable Harm as to Contractual Misconduct ................... 13

         B.       Premier is Entitled to a Presumption of Irreparable Harm as to the
                  Misappropriation of its Trade Secrets ....................................................... 14

II.      PREMIER IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS .............. 16

         A.       Premier Has Shown Likelihood of Success on the Merits as to the
                  Misappropriation-Based Claims ............................................................... 16

                  1.       The DTSA and New York Misappropriation Claims ............................. 16

                  2.       Premier's Tortious Interference with Business Relations and
                           Unfair Competition Claims........................................................... 19

         B.       Premier Has Shown Likelihood of Success on the Merits as to the
                  Contract-Based Claims ............................................................................ 20

                  1.       Premier's Breach of Contract Claims Against Jose Tellez ...................... 20

                  2.       Premier's Breach of Contract Claims Against Tony Tellez and
                           TKL................................................................................................ 23

                  3.       Premier's Tortious Interference With Contract Claims ........................... 23

III.     THE BALANCE OF EQUITIES FAVORS AN INJUNCTION AND THERE IS
         NO NEED FOR A SECURITY BOND......................................................................... 24

CONCLUSION.................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*16 Casa Duse, LLC v. Merkin*,
791 F.3d 247 (2d Cir. 2015)...........................................................................19

*Advanced Magnification Instruments, Ltd. v. Minuteman Optical Corp.*,
135 A.D.2d 889 (3d Dep't 1987) ....................................................................19

*Anacomp v. Shell Knob Servs., Inc.*,
No. 93 Civ. 4003 (PKL), 1994 U.S. Dist. LEXIS 223
(S.D.N.Y. Jan. 7, 1994)...................................................................................18

*Balance Point Divorce Funding, LLC v. Scrantom*,
978 F. Supp. 2d 341 (S.D.N.Y. 2013).............................................................17

*BDO Seidman v. Hirshberg*,
93 N.Y.2d 382 (1999) ......................................................................................22

*Business Intelligence Services, Inc. v. Hudson*,
580 F. Supp. 1068 (S.D.N.Y. 1984)................................................................22

*Cardiocall, Inc. v. Serling*,
492 F. Supp. 2d 139 (E.D.N.Y. 2007) .............................................................19

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*,
696 F.3d 206 (2d Cir. 2012).............................................................................13

*Computer Assocs. Int'l, Inc. v. Bryan*,
784 F. Supp. 982 (E.D.N.Y. 1992) .......................................................13, 16, 17

*Devos, Ltd. v. Record*,
No. 15-cv-6916 (ADS)(AYS), 2015 U.S. Dist. LEXIS 172929
(E.D.N.Y. Dec. 24, 2015) .........................................................................13, 14, 15

*EarthWeb, Inc. v. Schlack*,
71 F. Supp. 2d 299 (S.D.N.Y. 1999)................................................................14

*Ecolab, Inc. v. Paolo*,
753 F. Supp. 1100 (E.D.N.Y. 1991) ................................................................20

*Ferguson v. Tabah*,
288 F.2d 665 (2d Cir. 1961).............................................................................24

*FTI Consulting, Inc. v. PricewaterhouseCoopers, LLP*,
8 A.D.3d 145 (1st Dep't 2004) ........................................................................21

ii

*Iannucci v. The Segal Co.*,
   No. 06 Civ. 4720 (PKL), 2006 U.S. Dist. LEXIS 43339
   (S.D.N.Y. June 26, 2006) .................................................................................22

*Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*,
   990 F. Supp. 119 (E.D.N.Y. 1997) ....................................................................22

*ITC Ltd. v. Punchgini, Inc.*,
   9 N.Y.3d 467 (2007) .........................................................................................19

*Locke v. Tom James Co.*,
   No. 11 Civ. 2961 (GBD), 2013 WL 1340841
   (S.D.N.Y. Mar. 25, 2013) ..................................................................................22

*Marsh USA Inc. v. Karasaki*,
   No. 08 Civ. 4195 (JGK), 2008 WL 4778239
   (S.D.N.Y. Oct. 31, 2008) ...................................................................................24

*Misys Int'l Banking Sys., Inc. v. TwoFour Sys., LLC*,
   6 Misc. 3d 1004(A) (Sup. Ct. N.Y. Cty. 2004) ..................................................22

*N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*,
   704 F. Supp. 2d 305 (S.D.N.Y. 2010) ................................................................25

*Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*,
   282 F. App'x 885 (2d Cir. 2008) ........................................................................14

*New York v. Mountain Tobacco Co.*,
   953 F. Supp. 2d 385 (E.D.N.Y. 2013) ..................................................................3

*Pontone v. York Group, Inc.*,
   No. 08 Civ. 6314 (WHP), 2008 WL 4539488
   (S.D.N.Y. Oct. 10, 2008) ...................................................................................21

*Russo v. Estee Lauder Corp.*,
   856 F. Supp. 2d 437 (E.D.N.Y. 2012) ................................................................20

*Semper v. N.Y. Methodist Hosp.*,
   786 F. Supp. 2d 566 (E.D.N.Y. 2011) ................................................................20

*Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC*,
   No. 10 Civ. 8976(RJH), 2011 WL 497978
   (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468 F. App'x 43 (2d Cir. 2012) ....................13, 25

*TBA Global, LLC v. Proscenium Events, LLC*,
   114 A.D.3d 571 (1st Dep't 2014) .......................................................................22

*Ticor Title Ins. Co. v. Cohen*,
   173 F.3d 63 (2d Cir. 1999) .................................................................................13

*Town of Brookhaven v. Sills Road Realty*,
    No. CV 14–2286(GRB), 2014 WL 2854659
    (E.D.N.Y. June 23, 2014) ...........................................................................................25

*Uni-World Capital L.P. v. Preferred Frangrance, Inc.*,
    73 F. Supp. 3d 209, 235 (S.D.N.Y. 2014) ................................................................21

*Wrap-N-Pack, Inc. v. Eisenberg*,
    No. 04-cv-4887 (DRH)(JO), 2007 U.S. Dist. LEXIS 23084
    (E.D.N.Y. Mar. 29, 2007) ..........................................................................................22

**Statutes**

18 U.S.C. § 1839(3) .............................................................................................................16, 17

18 U.S.C. § 1839(5) ...................................................................................................................17

18 U.S.C. § 1839(6) ...................................................................................................................17

**Other Authorities**

Fed. R. Civ. P. 65 .........................................................................................................................1

Pursuant to Fed. R. Civ. P. 65, Plaintiff Premier Fixtures, LLC ("Premier" or the "Company") moves by Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction against Defendants Evolution Fixtures ("Evolution"), Jose L. Tellez ("Jose Tellez"), J. Antonio Tellez ("Tony Tellez"), TKL Associates Inc. ("TKL"), Paul Saudino ("Saudino"), and Harry Mayors ("Mayors") (collectively, "Defendants").

## PRELIMINARY STATEMENT

Defendants have expropriated Premier's trade secrets, customer goodwill and employees to create and operate Evolution as a new competing business. A leading store fixtures business, Premier provides the engineering, design, manufacture or supply of merchandising displays and fixtures in retail stores. Defendants have engaged in various misappropriation acts through improper acquisition, use, and disclosure of Premier's trade secrets. Defendants Jose Tellez, Tony Tellez, and TKL have also breached confidentiality and restrictive covenant agreements with Premier. Jose Tellez is Premier's former President. His brother, Tony Tellez, is Premier's former Chief Operating officer. Both have been paid handsomely in exchange for entering into their agreements with Premier. Jose Tellez and Tony Tellez are flagrantly disregarding those agreements. Because of Defendants' misconduct, Premier seeks full compensatory, consequential, recoupment and exemplary damages as well as injunctive relief including the need for immediate restraints.

Monetary relief itself is inadequate as Defendants have already caused serious harm to Premier and threaten more. Defendants Jose Tellez and Tony Tellez contractually acknowledge irreparable harm. There is also a likelihood of success on both the misappropriation-based and contract-based claims. In late June, Premier learned of Evolution's actions from customers, vendors and employees. Premier's subsequent investigation demonstrates that other Defendants are participating. These include Defendants Paul Saudino, a Premier engineer who resigned in

1

May and then joined Evolution, and Harry ("Hank") Mayors, Premier's long-time head of IT who abruptly resigned in April.

The most significant violations so far concern Defendants' efforts at shifting Dick's Sporting Goods work away from Premier to Evolution. Dick's is Premier's main customer. Although still a Premier consultant, Defendant Jose Tellez phoned Dick's approximately ten times during the first half of 2016 to seek and obtain business for Evolution. Jose and the other Defendants focused especially on replacing Premier as Dick's provider of metal ball holder fixtures. To do so, they improperly disclosed, used and altered a set of confidential Premier designs and drawings (the "Ball Holder Specs") comprised of nine pages, stamped with Premier's logo and identified by a Premier part number that expressly warn on each page: **"This drawing and design are the intellectual property of Premier Store Fixtures. Any reproduction or alteration without permission from PSF is prohibited."**

Other customers, such as Phillips Van Heusen and Academy Sports, are now reporting that Defendants solicited them to do business with Evolution using Premier's confidential and proprietary intellectual property and other information. And Defendant Jose Tellez is recruiting, soliciting and hiring Premier employees to work for Evolution. He met with Premier employees in New York during the week of June 6, 2016. Evolution, in fact, markets expertise in store fixtures work through a "team" of "experts" knowledgeable about thirteen major retailers, such as Dick's, Nike, Target and TJMaxx; *all thirteen are Premier customers*.

Defendants have violated the Defend Trade Secrets Act of 2016 ("DTSA") and New York misappropriation law and have committed various other acts of statutory, contractual and tortious misconduct.  Premier seeks immediate injunctive relief to ensure that the violations

cease immediately and that Defendants return to Premier all of Premier's confidential and proprietary information in their possession.[1]

## BACKGROUND

### I.    PREMIER STORE FIXTURES

Founded in 2000 as Premier Fixtures, Inc., Premier is a leader in the engineering, design, manufacturing, and logistics capabilities of store displays, fixtures and accessories. Goodman Aff., ¶ 4.[2] The Company supplies fixtures for the opening, refreshing, and remodeling of major sporting goods, apparel and other retail brands' stores. *Id.* Premier has conceived and implemented store layouts and retail programs for large retailers, such as Dick's Sporting Goods, Phillips Van Heusen, Nike, Field and Stream, Finish Line, and Teva. *Id.* at ¶ 7. The Company expends significant time, resources and investment to develop and sustain those customer relationships and customer goodwill. *Id.* at ¶ 9.

Premier closely guards the Company's confidential and proprietary information. It restricts information about a customer's needs to particular client service teams. It permits access to customer designs and other sensitive information only through protected passwords. *Id.* at ¶ 10.  It provides employees with a handbook detailing policies about safeguarding confidential and proprietary information as well other Company trade secrets. Premier also enters into express agreements with certain executives and employees, setting out explicit prohibitions on

---

[1] Premier also requests expedited discovery to ascertain whether additional trade secrets have been misappropriated and to discover the scope of Evolution's disruption of Premier's customer relationships since at least September 2015.  *See New York v. Mountain Tobacco Co.*, 953 F. Supp. 2d 385 (E.D.N.Y. 2013) (permitting expedited discovery).

[2] "Compl." shall refer to the Complaint filed on July 18, 2016.  Premier's affidavits and declarations are: the Affidavit of Nelson Goodman ("Goodman Aff."), Declaration of William Moylan ("Moylan Decl."), and the Declaration of Daniel D. Edelman ("Edelman Decl.").

the use and disclosure of confidential and proprietary information. *Id.* at 16. Both Defendants Jose Tellez and Tony Tellez entered into such agreements.

Pursuant to an October 2013 Asset Purchase Agreement ("APA"), Premier Inc. sold the Company's assets to Premier Fixtures, LLC. Defendant Jose Tellez agreed to the APA both as Premier, Inc.'s President and as one its stockholders. *Id.* at ¶ 59, Ex. O. In the APA, Jose Tellez agreed to strict confidentiality obligations and non-competition and non-solicitation restrictions and received lucrative payments in the transaction of over $5 million cash consideration and equity consideration comprised of ownership units in Premier Fixtures, LLC.

As part of the asset purchase transaction, Jose Tellez also entered into an employment agreement to remain Premier's senior executive (the "Employment Agreement"). Here, too, he agreed to contractual obligations prohibiting the use and disclosure of Premier's confidential information and restraining him from competing with the Company and from soliciting its customers, vendors and employees. In exchange, Jose Tellez was to receive a base salary of $350,000, plus incentive monies substantially enhancing his total compensation. *Id.* at ¶ 62.

On July 17, 2014, Jose Tellez entered into a Separation Agreement and Release of Claims ("Jose's Separation Agreement") with the Company. Simultaneously, Jose entered into a Consulting Agreement under which Premier guaranteed him substantial base compensation plus incentive compensation. Goodman Aff., Ex. Q (2014 Consulting Agreement). On July 25, 2015, Tailwind Capital acquired all of the member interest in Premier, including Jose Tellez's share. *Id*. at ¶ 72. The Tailwind transaction resulted in Jose receiving an additional $8.6 million. Combining his net proceeds from the sales, salary and consulting fees, Jose received almost sixteen million dollars from Premier over the last three years. *Id.* at ¶ 73.

## II.   DEFENDANTS' CONFIDENTIALITY AND RESTRICTIVE COVENANTS AGREEMENTS

Defendants Jose Tellez, Tony Tellez and TKL (a company owned by Tony) entered into agreements with Premier that prohibit the use and disclosure of Premier's confidential and proprietary information. Goodman Aff., ¶ 75. In addition to the APA and Employment Agreement confidentiality restrictions, Jose Tellez also agreed in his Consulting Agreement to non-compete and non-solicitation restrictions. These are detailed in Premier's Complaint. *See* Compl., ¶¶ 65-69, 137-149. The essential provisions are summarized below.

### A.   Jose Tellez

Jose Tellez's confidentiality and restrictive covenant obligations in the APA and the Consulting Agreements, respectively, are as follows:

#### 1.   APA Restrictions

Pursuant to Article X of the APA, Jose Tellez agreed that "[u]ntil the end of the five (5) years" or through October 31, 2018, he was required "to keep all Proprietary Information of [Premier] . . . confidential and not to disclose any such Proprietary Information to any Person." Goodman Aff., ¶ 59. Jose Tellez also agreed that, until October 31, 2018, he was required "not [to] use such Proprietary Information." *Id.*

APA Article X also binds Jose Tellez until October 31, 2018 to a series of non-competition and non-solicitation restrictions "[a]s a material inducement to P[remier]'s consummation of the [transaction], including P[remier]'s acquisition of the Goodwill." *Id.*, Ex. O at §10.2. Specifically, Jose agreed that he would not "directly or indirectly . . . without prior written consent of P[remier] . . . (i) participate or engage in, or offer any services related to any lines of business" that Premier does "or "directly or indirectly" become an "Interested Person" (such as an owner, employee, agent or consultant) in a company engaging in the same business that Premier does. *Id.* at 10.2(b). Jose Tellez also agreed to various "non-solicitation" and "non-

acceptance" restrictions in Article X including, among others, refraining from "directly or indirectly" soliciting, influencing or inducing Premier customers, vendors, suppliers, employees, or independent contractors to terminate or modify any relationship with Premier or do business with another entity. *Id.* at § 10.2(a).

In Section 10.3 of the APA, Jose explicitly acknowledged "that any breach or threatened breach by [him] of any provision of [Article X] will cause continuing and irreparable injury to [Premier] for which monetary damages would not be an adequate remedy" and that Premier "shall be entitled to injunctive relief . . . with respect to any such breach or threatened breach." *Id.* at § 10.3.  Section 10.3 emphasized that "in any Legal Proceeding to so enforce any provisions of this Article X," Jose could not "assert the claim or defense that an adequate remedy at [l]aw exists or that injunctive relief is not an appropriate form of relief." *Id.*

## 2.    Consulting Agreement Restrictions

In Section 4 of his July 17, 2014 Consulting Agreement, Jose Tellez agreed to "be bound by and abide by the terms of" an attached Exhibit 2 Restrictive Covenant Agreement. He agreed in the Restrictive Covenant "at all times" to "hold in strictest confidence and not to use or disclose . . . any Confidential Information of the Company." *Id*., Ex. Q at §4.  He further agreed that after his consultancy ended, he would not "use, publish, divulge, communicate, share, provide access to or otherwise disclose any Confidential Information." *Id.* at Restrictive Covenant Agreement §2.  The Consulting Agreement defines "Confidential Information" broadly to include "proprietary or confidential information, technical data, trade secrets or know-how, including research, product plans and developments, . . . customer lists and customers, prospective customers and contacts, . . . [and] terms and conditions of business relationships with customers…." *Id.*

The Consulting Agreement also substantially constrained Jose Tellez from communicating and interacting with Premier's employees, customers, prospective customers and vendors. In Exhibit 1, the Consulting Agreement defined the nature, scope and extent of Jose's services to Premier as consultant. Goodman Aff., Ex. Q-1.  It emphasized Jose was not permitted to "contact and engage in discussions" with any Premier employees unless Premier had previously approved of such contacts in writing.[3] *Id.* Exhibit 1, likewise, underscored "that in no event shall" Jose "contact or engage in any discussions with any customer of the Company or . . . . any vendor of the Company, in each case unless previously approved in writing by the Company." *Id.*

The Restrictive Covenant Agreement also contained non-competition and non-solicitation restrictions in Section 4 identical to those in Jose's Employment Agreement and comparable to those set out in Article X of the APA. Goodman Aff., ¶ 70. These restrictive covenants apply during the pendency of Jose's Consulting Agreement and for, at least, a two year period thereafter. *Id.* at Ex. Q-2 §1. Section 9 of the Restrictive Covenant Agreement, however, qualifies that if Jose breaches the restrictive covenants "the restrictions . . . will be extended for a period equal to the period that [he] was in breach." *Id*. at §9. Among other prohibitions, Section 4 of the Restrictive Covenant Agreement prevents Jose from inducing, soliciting, recruiting or attempting to persuade Premier employees to terminate employment with the Company. *Id.* at § 4. Section 4 also expressly prohibits Jose from "solicit[ing] business from any Customer or Prospective Customer" of Premier. *Id.*

---

[3] On August 6, 2014, Premier notified Jose Tellez in writing that he had already violated Exhibit 1 of the Consulting Agreement through email correspondence with Premier employees, and reminded Mr. Tellez that all future payments including compensation depended upon full compliance with the agreement's terms. Goodman Aff., ¶71.

In Section 6(a) of the Restrictive Covenant Agreement, Jose agreed that Premier "shall have the right . . . to obtain . . . preliminary and permanent injunctive relief to restrain any breach or threatened breach of, or otherwise to specifically enforce any such covenant." *Id.* at §6(a). Furthermore, he "waive[d] any right to require any bond or security in connection" with Premier's applying for injunctive relief. *Id.*

## B.    Tony Tellez and TKL Associates

Tony Tellez entered into a separation agreement ("Tony's Separation Agreement") with Premier on June 7, 2013 on behalf of himself and as President of TKL. Goodman Aff., ¶ 75. The agreement provided Tony Tellez and TKL with "separation benefits" for a one year period. *Id.* at ¶ 76. These payments were expressly conditioned "upon [their] compliance with all of the terms and conditions of [the] Agreement." *Id.* at ¶ 77. Section 8 provides that, for three years, or through June 3, 2016, Tony Tellez and TKL would not disclose to any third party or make use of Premier's proprietary and confidential information for a period of three years after his termination. *Id.* at ¶ 78. In Section 10, Tony Tellez and TKL agreed to continuing obligations with no time limitation, including an understanding "that [they] will not, without the prior written consent of Premier, use any such [confidential] information for [their] personal benefit" or "disclose [Premier confidential information] to any third party." *Id.* at ¶ 80. Pursuant to Section 11, Tony Tellez and TKL agreed "that the remedy at law for any breach of [Sections 8 and 10] will be inadequate, and that [Premier] shall be entitled to injunctive relief." *Id.* at ¶ 77.

## III.    DEFENDANTS' MISCONDUCT

Evolution Fixtures, LLC, doing business as Evolution Store Fixtures, registered as a Florida limited liability corporation on January 27, 2016. Edelman Decl., ¶ 3. Evolution's website, LinkedIn page, Facebook site and other on-line marketing materials characterize a business that does the same store fixtures work as Premier, for the same Premier customers and

with a "team of experts" who worked at Premier. Goodman Aff., ¶¶ 23-25. Its online marketing materials contain Premier's pictures and diagrams. *Id.* They feature assignments that were Premier's projects. *Id.* at ¶ 25.

In late June 2016, Premier learned that Evolution misappropriated Premier's trade secrets in order to win business from Dick's – one of Premier's biggest customers.  On June 27, 2016, one of Premier's vendors, Xiamen Mavis Display Fixtures Co., Ltd. ("Mavis") forwarded to Premier's executives a copy of an email sent by "Jose A. Tellez" (with a copy to Tony Tellez) to Mavis with a date of April 12, 2016 at 8:16 a.m. ("Mavis Email"). *Id.* at ¶ 27.  Attached to this email was an RFQ for 11,040 ball holders with a Part Number "DSG-MBHLDR-G-W and Premier's confidential "Ball Holder Specs." *Id.* at ¶ 31. The Mavis Email reads in pertinent part:

> Attached please find our RFQ #10002 along with drawings of the item . . . customer has requested the Silk Screen log per sample below to be imprinted on the signholder channel as shown on Page 9 of the attached drawing . . . .[W]e need these packed 8 pcs per carton or 16 pcs per carton . . . We need your factory to ship NO later than 05/21/16 to Los Angeles . . . try to quote no later than Wednesday 04/13/16.

*Id.* at ¶ 29.[4]

Premier engineer, Jeremy Conlon ("Conlon"), created the Ball Holder Specs in March 2014 and Jose Tellez, then Premier's senior executive, approved a final version on April 24, 2014. *Id.* at ¶ 34.  The Company invested resources, time, expertise and money in creating the Ball Holder Specs for the purpose of rolling out metal ball holder fixtures at all Dick's stores. All nine pages of the Ball Holder Specs were stamped with Premier's logo and identified the

---

[4] The Mavis Email purports to be sent by "Jose A. Tellez" using an email address of jatellez@evolutionfixtures.com, with a copy to "Tony Tellez" at ttellez@evolutionfixtures.com Goodman Aff., ¶ 28. Tony Tellez (whose full name is Jose A. Tellez) only uses the latter email address, as he indicates on his LinkedIn profile and elsewhere.  Premier contends that Defendant Jose Tellez and not Tony Tellez composed and sent the Mavis Email. Compl., ¶¶ 113-114. Whether it was sent by Jose Tellez or Tony Tellez, the email breached either of the Defendants' agreements with Premier.

author as "JDC," referring to Premier's Conlon.  Each page also identifies the fixture by a Premier part number, "DSG-MBHLDR."  Importantly, each page warned: **"This drawing and design are the intellectual property of Premier Store Fixtures Inc. Any reproduction or alteration without written permission from PSF is prohibited."**[5]

Premier supplied Dick's Stores with ball holder fixtures in each of 2014 and 2015.  *Id.* at ¶ 37.  In late March 2016, however, Dick's requested that Premier modify the ball holder fixtures to affix the Wilson Sporting Goods logo on the fixture base and supply each Dick's store with 16 fixtures by the third week of June. *Id.*  On the morning of April 11, 2016, Premier proposed pricing to Dick's for producing fixtures with the Wilson® logo. *Id.* at ¶ 38.  Unbeknownst to Premier, however, that same evening, someone identified as "JTellez" accessed the Ball Holder Specs for Evolution's behalf and altered them by inserting on page 9 Photoshopped versions of the Wilson® logo.  Moylan Decl., ¶ 7(d).  The stamp identifier suggests that Defendant Jose Tellez made the changes.  *Id.* at ¶ 9.

Simultaneously, Defendant Paul Saudino was expropriating Ball Holder Specs information from the Premier computer system.  Saudino was then a Premier engineer but had no responsibility or involvement with the Dick's account. Goodman Aff., ¶¶ 18, 34.  On the evening of April 11, 2016 (or early on April 12), Saudino forwarded documents from psaudino@premierfixtures.com to PaulSaudino@gmail.com. Moylan Decl., ¶ 14.  These were PDF and .ai files relating to "DSGMBHLDR" and "Wilson." *Id*.  At around the same time, Saudino's hard drive shows the creation of a file "DSG-MBHLDR.SLDASM," referring to the

---

[5] Consistent with Premier's policies, Premier provided to Dick's "top level" drawings of the ball holder fixtures that are the first three pages of the Ball Holder Specs. It did not provide all nine pages, which contain Premier's trade secret designs and specifications. Goodman Aff., ¶ 36. Premier has redacted the Ball Holder Specs in the public filing but is prepared to arrange for the Court to review the unredacted versions of the Ball Holder Specs' designs and drawings *in camera*.

Solidworks design software used by Premier. *Id* at ¶ 13.  Also around the same time, Defendant Saudino created two shortcut files on his desktop allowing access from his D: Drive personal folders to two files, both of which contain Photoshopped applications as to the ball holder fixtures and are denominated "DSG-MBHLDR-wilson.psd" and "DSG-MBHLDR-wilson-2.psd." *Id* at ¶ 12.

Later in April, Dick's told Premier that its services were not needed this year to produce the ball holder fixtures.  Premier has now learned from Dick's Senior Director of Purchasing, Gregg Graves ("Graves") that Defendant Jose Tellez had been communicating with him since around the end of 2015 about Dick's doing business with Evolution. Goodman Aff., ¶ 42. When Graves asked Jose if he could be soliciting this business in light of his relationship with Premier, Jose rationalized that he was acting on behalf of his brother, Tony. *Id*. Graves estimates that he had at least seven to ten phone conversations with Jose Tellez about Evolution. *Id.* at ¶ 44. Graves informed Jose that Evolution would have to be qualified by Dick's procurement department before doing any business. After Evolution was qualified, it bid for the ball fixtures work and won. *Id.* at ¶ 43.

Defendants expropriated Premier's trade secrets and customer goodwill to perform the ball fixtures work.  They improperly acquired and altered the Ball Holder Specs.  They disclosed them to Premier's vendor, Mavis, in seeking an RFQ. And they used the Ball Holder Specs for the purpose of having the fixtures manufactured by a different company, Xiamen Constant Imp. & Exp. Trade Co. ("Constant") between April and June 2016. Goodman Aff., ¶ 39. Constant shipped the fixtures to Evolution on June 5, 2016, at which point Evolution delivered them to all 665 Dick's stores and was paid. *Id.* at ¶ 40.

Defendants are using Premier's trade secrets and exploiting the Company's customer goodwill with other Premier customers. Major Premier customers, such as Phillips Van Heusen

and Academy Sports, have reported to Premier that Defendants, including Jose Tellez, have solicited business from them on behalf of Evolution. Goodman Aff., ¶¶ 47-48. Defendants are trying to take away business from Premier and/or obtain business for Evolution. Defendant Jose Tellez has engaged in these communications and solicitations in direct violation of his non-competition and non-solicitation restrictive covenants with Premier.

Defendant Jose Tellez is also violating his agreements with Premier by communicating with Premier employees. During the first quarter of 2016, Jose had extensive communications with Defendant Mayors. As head of Premier's IT department, Mayors' responsibilities included administering the Company's relationship with his former employer, Stafford Computer Associates ("Stafford"), where Premier hosts its servers. Goodman Aff., ¶ 52. At the very end of March 2016, Mayors forwarded to Saudino, who had no IT responsibilities at Premier, confidential Company information about Stafford including its services contract and pricing information. Moylan Decl., ¶¶ 17-18. Then, on Saturday, April 2, 2016, Mayors communicated with someone at Evolution. Goodman Aff., ¶ 53. That same day, Evolution shifted the hosting of its website server to Stafford. By the end of the next week, Mayors abruptly resigned from Premier. *Id.* at ¶ 54.

Defendant Jose Tellez has also directly violated his non-solicitation of employees' restrictions by soliciting, hiring and attempting to hire Premier employees. Saudino resigned from Premier in May 2016, indicating that he would be joining his "old company." *Id.* at ¶ 18. By June 2016, Saudino's LinkedIn profile showed that he was now Evolution's Vice President of Design and Engineering. *Id.* at ¶ 17. By "old company," Saudino apparently meant "old colleagues." And, during the week of June 6, 2016, Jose met with three Premier employees in New York to discuss working at Evolution. *Id.* at ¶¶ 55-56.

## ARGUMENT

The Court should grant Premier's motion for a temporary restraining order and/or preliminary injunction because the Company has shown the necessary standards of: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012)(citation omitted). These standards apply to misappropriation of trade secrets and breach of restrictive covenants cases. *Devos, Ltd. v. Record*, No. 15-cv-6916 (ADS)(AYS), 2015 U.S. Dist. LEXIS 172929 (E.D.N.Y. Dec. 24, 2015); *Computer Assocs. Int'l, Inc. v. Bryan*, 784 F. Supp. 982, 986 (E.D.N.Y. 1992). Defendants admit that their misconduct constitutes irreparable harm that cannot be adequately remedied at law. Premier has also demonstrated that the Company will likely succeed on the merits of its misappropriation-based and breach of contract-based claims, that the balance of hardships tip in its favor and that there is no need for a security bond in this case.

## I.      PREMIER HAS SUFFERED IRREPARABLE HARM

### A.      Defendants Admit Irreparable Harm as to Contractual Misconduct

"'[I]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.'" *Devos*, 2015 U.S. Dist. LEXIS 172929, at **21-22 (quoting *Singas Famous Pizza Brands Corp. v. New York Adver. LLC*, 468 F. App'x 43, 45 (2d Cir. 2012)). Where a defendant expressly agrees that there is irreparable harm not sufficiently remedied by money damages, the Second Circuit holds "that fact sufficient to discharge the movant's burden of showing irreparable harm for purposes of a preliminary injunction." *Id.* at *22; *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (concession of irreparable injury is an admission);

*Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*, 282 F. App'x 885, 887 (2d Cir. 2008) (irreparable harm satisfied where plaintiff concedes no adequate money damages).

Defendants Jose Tellez, Tony Tellez and TKL have all admitted irreparable harm. Jose Tellez acknowledged in the APA that his use and disclosure of Premier's confidential and proprietary information and his failure to abide by non-competition and non-solicitation restrictions "cause continuing and irreparable injury to [Premier] for which monetary damages would not be an adequate remedy." Goodman Aff.,, Ex. O at §10.3 He conceded that he cannot "assert the claim or defense that an adequate remedy at [l]aw exists or that injunctive relief is not an appropriate form of relief." *Id.* And he affirmed in the Consulting Agreement that Premier "shall have the right . . . to obtain . . . preliminary and permanent relief" in the event he breaches or threatens to breach his confidentiality and restrictive covenant obligations. *Id.*, Ex. Q at Restrictive Covenant Agreement §6. Likewise, Tony Tellez and TKL acknowledged "that the remedy at law for any breach of [their confidentiality obligations] will be inadequate, and that [Premier] shall be entitled to injunctive relief."

### B.      Premier is Entitled to a Presumption of Irreparable Harm as to the Misappropriation of its Trade Secrets

Moreover, Courts employ a more "relaxed" approach to irreparable harm and presume its existence "[i]n cases such as this, involving a person competing with his or her former employer, particularly when such activity is prohibited by a restrictive covenant or is facilitated by the misappropriation of trade secrets or customer information. . . ." *Devos*, 2015 U.S. Dist. LEXIS 172929, at *24-25 (quoting *Global Switching Inc. v. Kasper*, No. 06-cv-412, 2006 U.S. Dist. LEXIS 44450, at *35 (E.D.N.Y. June 29, 2006)). "[I]rreparable harm may be presumed if a trade secret has been misappropriated[]" because "[a] trade secret, once lost, is lost forever; its loss cannot be measured in money damages." *EarthWeb, Inc. v. Schlack*, 71 F. Supp.2d 299, 308-09 (S.D.N.Y. 1999). And "when a party violates a non-compete clause, the resulting loss of

14

client relationships and customer good will built up over the years constitutes irreparable harm" because it is difficult to quantify the incurred erosion in customer goodwill. *Devos*, 2015 U.S. Dist. LEXIS 172929, at \*24 (quoting *Johnson Controls, Inc. v. A.P.T. Critical Sys*., 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004). The relaxed irreparable harm presumption also applies where there is solicitation of employees in contravention of a non-solicitation agreement. *Id.* at \*26.

The irreparable harm presumption is well founded here because there is now evidence and information that Defendants have already misappropriated Company trade secrets, exploited its customer goodwill and hired or attempted to hire Premier employees to work at Evolution. Defendants accessed, altered, disclosed and used Premier's 2014 Ball Holder Specs without Premier's authorization. The Ball Holder Specs contained Premier's confidential and proprietary information. Each page contained an explicit legend, warning that the designs and drawings were Premier's intellectual property that could not be used or altered.

Likewise, Defendants have been actively seeking business for Evolution from Dick's and other Premier customers. The Dick's solicitations resulted in Premier losing business to Evolution, as Dick's stopped using Premier to supply the ball holder fixtures and instead received the fixtures from Evolution in June of this year. But other Premier customers, such as Phillips Van Heusen and Academy Sports are also reporting that Defendants have solicited business for Evolution using Premier's confidential and proprietary information. Goodman Aff., ¶ 48. Evolution's website underscores Defendants' intentions, identifying thirteen customer targets; *all are Premier customers.*

Finally, there is irreparable harm because Defendants are actively recruiting and hiring Premier's employees in order to build Evolution. Besides Saudino, who already jumped ship from Premier to Evolution, Defendant Jose Tellez met with three other Premier employees in

New York during the week of June 6, 2016 to discuss working at Evolution. Jose Tellez has reached out to other Premier employees as well.

## II.   PREMIER IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

Premier has supplied sufficient evidence and information demonstrating likelihood of success on the merits with respect to both misappropriation-based claims and contract-based claims. The misappropriation-based claims include, among others, the DTSA, New York misappropriation, unfair competition and tortious interference with business relations claims, alleged in Counts I-IV.  The contract-based claims refer to the breach of contract claims alleged in Counts IV-VI as well as the tortious interference claims alleged in Counts VI-X.

### A.   Premier Has Shown Likelihood of Success on the Merits as to the Misappropriation-Based Claims

#### 1.   The DTSA and New York Misappropriation Claims

The DTSA defines "trade secrets" to mean "all forms and types of financial, business, scientific, technical, economic, or engineering information. . . ."  These "include[e] patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes…" 18 U.S.C. § 1839(3).  The statute applies to trade secrets "whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing…" *Id.* Similarly, New York law defines trade secret to include "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."  *Computer Assocs. Int'l, Inc. v. Bryan*, 784 F. Supp. 982, 987 (E.D.N.Y. 1992) (quoting *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990)). There is no question that Premier's confidential and proprietary intellectual property, such as the Ball Holders Specs, fits within the DTSA and New York definitions of a trade secret.

Under the DTSA, trade secret protection exists where an owner "take[s] reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).  New York courts consider similar factors in determining whether trade secret protection exists. *Computer Assocs.*, 784 F. Supp. at 987 (citing *Eagle Comtronics, Inc. v. Pico, Inc.*, 89 A.D.2d 803, 803-04 (4th Dep't 1982)).

Both the DTSA and New York law define misappropriation acts as any or all of acquisition, disclosure and/or use of a trade secret. 18 U.S.C. § 1839(5); *Computer Assocs.*, 784 F. Supp. at 987-88. Actionable misappropriation occurs, for example, where a defendant uses the trade secret without consent from its owner and the defendant had originally acquired the trade secret through improper means or knew or had reason to know that the trade secret was derived from or through a person who used improper means to acquire it. *Id.* "Improper means" includes, among other things, "theft" and/or "breach or inducement of a breach of a duty to maintain secrecy" as well as "espionage through electronic or other means[.]"  18 U.S.C. § 1839(6); *Balance Point Divorce Funding, LLC v. Scrantom*, 978 F. Supp. 2d 341, 353 (S.D.N.Y. 2013) (misappropriation under New York law occurs when defendant uses the trade secret in breach of an agreement or by improper means).

Premier safeguards, protects and limits the disclosure and use of its trade secrets. Individuals may only access Premier's designs, specifications and drawings and other Premier documents by password-protected entry onto Premier's computer system. Goodman Aff., ¶ 10. Many customer-related documents, including custom fixture designs such as the Ball Holders Specs, have an express written legend stating that the documents "are the intellectual property of Premier" and that "[a]ny reproduction or alteration without permission from [Premier] is

prohibited." *Id.* at ¶ 33. In the Second Circuit, such warning legends are "compelling evidence" of steps taken to safeguard trade secret protection. *Anacomp v. Shell Knob Servs., Inc.*, No. 93 Civ. 4003 (PKL), 1994 U.S. Dist. LEXIS 223, at *29 (S.D.N.Y. Jan. 7, 1994).

Moreover, as in *Anacomp*, Premier has supplied additional "compelling evidence" of protective measures it takes to safeguard its trade secrets. At Premier, employees are provided with the Handbook, which discusses the duty to protect Premier's confidential and business information and warns employees that improper use and disclosure of trade secrets or confidential information are grounds for termination. Goodman Aff., ¶ 11-16. Premier also enters into explicit contractual agreements with certain employees and former employees, proscribing in detail their use and disclosure of confidential and proprietary information. Defendants Jose Tellez, Tony Tellez and TKL are bound by such agreements.

Premier derives economic value from its trade secrets. For example, the Ball Holder Specs are valuable designs that Evolution used in June 2016 to earn $66,000 from Dick's, Premier's leading customer.[6] Goodman Aff., ¶ 43. Evolution has also tried to exploit Premier's valuable client relationships and customer goodwill with many longstanding Premier customers, such as Dick's, Phillips Van Heusen and Academy Sports, by professing to have a team of experts that has worked with those retailers and then actively soliciting work from them using Premier's confidential and proprietary intellectual property. Premier invested significant time, resources and money in developing those valued relationships. *Id.* at ¶ 9. Evolution wants to capitalize on that investment and goodwill without paying anything.

---

[6] Evolution's misappropriation of Premier's drawings and designs, such as the Ball Holder Specs, undercuts any attempt by Defendants to challenge the existence of trade secret protection on grounds that the trade secrets were reverse engineered. The evidence is clear that Defendants did not reverse engineer Premier's designs and drawings in working with vendors or soliciting customers; they just used Premier's very own documents. "[T]he proper inquiry is not whether defendants alleged trade secret *can be* discovered by reverse engineering, but whether in fact it has been." *Anacomp*, 1994 U.S. Dist. LEXIS 223, at *36 (emphasis in original).

Finally, Defendants have clearly improperly used and disclosed Premier trade secrets. Between April and June 2016, Defendants used the Ball Holder Specs to produce ball holder fixtures that Evolution supplied to Dick's 665 stores in June.[7]  Defendants Jose Tellez, Tony Tellez and TKL are all bound by confidentiality provisions that they breached. These breaches fall squarely into the definition of "improper means" under the statute. In short, Premier has provided sufficient evidence and information warranting a finding that it is likely to succeed on the merits as to its DTSA and New York misappropriation claims.

### 2.   Premier's Tortious Interference with Business Relations and Unfair Competition Claims

Premier is also likely to succeed on the merits as to the related claims for tortious interference with business relations and unfair competition.  There is tortious interference with business relations because Premier can show that "(1) [it] had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (internal quotation marks and citation omitted).  Unfair competition and misappropriation are "dishonest, unfair, or improper means."  *See, e.g., Cardiocall, Inc. v. Serling*, 492 F. Supp. 2d 139, 153 (E.D.N.Y. 2007).  Unfair competition exists where a defendant misappropriates "the results of the skill, expenditures and labors of a competitor. . . ."  *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476-477 (2007).  "An employee's illegal physical taking or copying of an employer's files or confidential information constitutes actionable unfair competition."

*Advanced Magnification Instruments, Ltd. v. Minuteman Optical Corp.*, 135 A.D.2d 889, 891 (3d

---

[7] A private right of action exists under the DTSA in this case because the statute appl[ies] "with respect to the  misappropriation of a trade secret, . . . for which any act occurs on or after" May 11, 2016. Defend Trade Secrets Act, P.L. 114-153, § 2(a), (d)(1), 130 Stat. 376, 381-82 (2016). Defendants improperly used the Ball Holder Specs between April and June 2016.

Dep't 1987).  In fact, "even where the information would not otherwise qualify as a trade secret, the unauthorized physical taking and exploitation of internal company documents . . . is to be enjoined as unfair competition." *Ecolab, Inc. v. Paolo*, 753 F. Supp. 1100, 1111 (E.D.N.Y. 1991) (unfair competition found where competitor misappropriated invoices and used them to compete with former employer).  Thus, even if the Ball Holder Specs were not considered trade secrets – and they most certainly are – but only "internal company documents," Premier would still likely prevail on the tortious interference and unfair competition claims.  Defendants used improper means through misappropriation of the Ball Holder Specs to unfairly compete and expropriate Premier's ball holder fixtures business for themselves.

**B.      Premier Has Shown Likelihood of Success on the Merits as to the Contract-Based Claims**

Premier has also asserted strong breach of contract and tortious interference with contract claims.  As to the breach of contract claims asserted against Jose Tellez, Tony Tellez and TKL, Premier can show it performed under valid and enforceable contacts but that these Defendants breached the contracts, resulting in damage to the Company.  *See, e.g., Russo v. Estee Lauder Corp.*, 856 F. Supp. 2d 437, 471 (E.D.N.Y. 2012). As to tortious interference with contract claims, Premier can also establish that other Defendants knew about the relevant Defendants' contracts but took intentional steps to procure a breach without justification, resulting in damages to the Company. *Semper v. N.Y. Methodist Hosp.*, 786 F. Supp. 2d 566, 583 (E.D.N.Y. 2011).

**1.      Premier's Breach of Contract Claims Against Jose Tellez**

Premier is likely to succeed on the two breaches of contract claims it has asserted against Jose under the APA and the Consulting Agreement respectively. In addition to restrictions on his use and disclosure of Premier's confidential information, Jose Tellez also agreed to non-competition and non-solicitation restrictions. Premier has supplied evidence and information with this motion that Jose Tellez communicated with Premier customers, including Dick's, for

20

the purpose of promoting Evolution, and with Premier employees to try and convince them to work for Evolution.  These actions directly contravene those agreements.

These restrictive covenants are valid and enforceable.  In the context of an asset purchase agreement, "the courts will enforce an incidental covenant by the seller not to compete with the buyer after the sale" and "[t]he sole limitations on the enforceability of such a restrictive covenant is that the restraint imposed be 'reasonable,' that is, not more extensive, in terms of time and space, than is reasonably necessary to the buyer for the protection of his legitimate interest in the enjoyment of the asset bought." *Pontone v. York Group, Inc.*, No. 08 Civ. 6314 (WHP), 2008 WL 4539488, at *3 (S.D.N.Y. Oct. 10, 2008) (quoting *Purchasing Assocs., Inc. v. Weitz*, 196 N.E.2d 245, 247 (1963)).  Restrictive covenants in asset purchase agreements are essential parts of the bargain and any breach adversely affects both the value of the transaction and business goodwill. *FTI Consulting, Inc. v. PricewaterhouseCoopers, LLP*, 8 A.D.3d 145, 146 (1st Dep't 2004). The APA imposed restrictive covenant obligations on Jose Tellez for a five year period, which New York courts have upheld as inherently reasonable. *Uni-World Capital L.P. v. Preferred Frangrance, Inc.*, 73 F. Supp. 3d 209, 235 (S.D.N.Y. 2014); *see, also Pontone*, 2008 WL 4539488, at *5 ("New York courts have found three to five year restrictions reasonable in the context of the sale of a business.").  These standards should apply as well to the Consulting Agreement because the attached Restrictive Covenant agreement obligations are the identical restrictions Jose agreed to in his 2013 Employment Agreement that was part of the asset purchased transaction and incidental to the APA.

To the extent the restrictive covenants in the Consulting Agreement are instead considered part of a standalone employment arrangement with Premier, they are still enforceable. Under New York law, an employer's non-competition and non-solicitation agreement is reasonable and enforceable, where it protects an employer's legitimate interest, does not impose

21

undue hardship on the employee and does not injure the public. *Wrap-N-Pack, Inc. v. Eisenberg*, No. 04-cv-4887 (DRH)(JO), 2007 U.S. Dist. LEXIS 23084, at *20 (E.D.N.Y. Mar. 29, 2007) (citing *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388-89 (1999)).  The primary consideration is whether the restraint protects a legitimate interest of the employer. *BDO Seidman*, 93 N.Y.2d at 390-91. One legitimate employer interest is protecting against misappropriation of trade secrets. *Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*, 990 F. Supp. 119, 127-28 (E.D.N.Y. 1997).  Another is protecting customer goodwill. *Locke v. Tom James Co.*, No. 11 Civ. 2961 (GBD), 2013 WL 1340841, at *8 (S.D.N.Y. Mar. 25, 2013); *TBA Global, LLC v. Proscenium Events, LLC*, 114 A.D.3d 571, 572 (1st Dep't 2014).

Premier has a legitimate interest in protecting its valuable trade secrets from competitors. As Premier's former president and consultant, Jose Tellez had "unfettered access" to the Company's confidential trade secrets, justifying a broad restriction on a going forward basis. *See Iannucci v. The Segal Co.*, No. 06 Civ. 4720 (PKL), 2006 U.S. Dist. LEXIS 43339, at *21 (S.D.N.Y. June 26, 2006).  Thus, his Restrictive Covenant Agreement reasonably prohibits Jose Tellez from competing in "any business that engages in the design, manufacture or supply of merchandising displays, fixtures, and related accessories for use in retail or store environments . . . where[ver] the Company does business or has Customers."  Goodman Aff., Ex. Q at Restrictive Covenant Agreement §1(c).  Such limitations are routinely enforced.  *See*, *e.g., Misys Int'l Banking Sys., Inc. v. TwoFour Sys.*, *LLC*, 6 Misc. 3d 1004(A) (Sup. Ct. N.Y. Cty. 2004) (enforcing non-competition agreement that barred the employee from competing in any country where the employer did business); *Business Intelligence Services, Inc. v. Hudson*, 580 F. Supp. 1068, 1069 (S.D.N.Y. 1984) (finding worldwide restriction was reasonable because plaintiff did business internationally). Jose Tellez will not suffer undue burden if the restrictions are enforced. Over the last three years, he has received over sixteen million dollars in consideration for his

agreements with Premier.  The restrictive covenants do not impact Jose's livelihood.  Thus, even if the restrictions are adjudged under the stricter employment agreement standard, they are reasonable.

The bottom line is that Jose Tellez entered into valid and enforceable agreements with Premier containing binding restrictive covenant obligations he has flagrantly disregarded. Premier will likely succeed in pursuing these breach of contract claims.

### 2.    Premier's Breach of Contract Claims Against Tony Tellez and TKL

Tony Tellez and TKL received $150,000 in payments for agreeing to Tony's Separation Agreement.  These payments, however, were expressly conditioned upon Tony Tellez and TKL complying with the agreements' terms and conditions, including restrictions on the use and disclosure of Premier's confidential information. While Premier performed its obligations by making the payments, Tony Tellez and TKL materially breached the confidentiality restrictions by disclosing and using Premier's confidential information with Premier's vendors and customers. Premier is likely to succeed on the merits of this claim.  It has supplied the Court with the actual misappropriated designs – the Ball Holder Specs – that Defendant disclosed to Mavis and other vendors and that were used by Constant to create the ball holder fixtures for Dick's. Tony and TKL acknowledged in Tony's Separation Agreement that such conduct would cause monetary damages (including costs and expenses) and necessitate injunctive relief.

### 3.    Premier's Tortious Interference With Contract Claims

Various Defendants tortuously interfered with the confidentiality and restrictive covenant agreements. Each of Defendants Tony Tellez, Saudino and Mayors had to know that Jose Tellez was violating his agreements with Premier because each participated in the efforts to misappropriate Premier information and/or secure business from Dick's. Tony Tellez received the Mavis Email. Paul Saudino actively participated in the expropriation and alteration of the

Ball Holder Specs. During this very same time period, Mayors had extensive communications with Jose Tellez, provided Saudino with other confidential and proprietary Premier information and then helped Evolution transfer its hosting company to Stafford.

They also each had to know that Tony Tellez was violating his continuing confidentiality provisions. Jose was certainly aware that Tony was breaching Tony's Separation Agreement because Jose signed the agreement. More generally, while during the first half of 2016, only Tony Tellez was Evolution's public face, each of the other individual Defendants actively promoted, assisted and obtained business for Evolution, including through the use and disclosure of Premier's confidential information. That is, each intentionally took steps to procure contractual breaches by Tony Tellez.

## III.    THE BALANCE OF EQUITIES FAVORS AN INJUNCTION AND THERE IS NO NEED FOR A SECURITY BOND

The balance of equities favors a temporary restraining order and preliminary injunction because Defendants have intentionally disregarded their legal and contractual obligations and threaten to continue doing so.  Defendants cannot identify countervailing interest; Evolution's objective is to compete unfairly with Premier's using the Company's intellectual property and exploiting the Company's customer goodwill. Absent an injunction, Defendants will continue their ongoing expropriation and use of Premier's trade secrets, customer goodwill and employees and Defendants Jose Tellez, Tony Tellez, and TKL will not cease from breaching their contractual obligations.

Finally, Premier requests that this Court exercise its "wide discretion" under Rule 65(c) by not requiring Premier to post a security bond. *Ferguson v. Tabah*, 288 F.2d 665, 675 (2d Cir. 1961).  First, in Section 6(a) of his Restrictive Covenant Agreement, Jose Tellez expressly "waive[d] any right to require any bond or security." *See Marsh USA Inc. v. Karasaki*, No. 08 Civ. 4195 (JGK), 2008 WL 4778239, at *21 (S.D.N.Y. Oct. 31, 2008) (no bond where parties

24

agreed no bond was required). Second, courts do not require a bond where parties agree to injunctive relief. *See, e.g., Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC*, No. 10 Civ. 8976(RJH), 2011 WL 497978, at *12 (S.D.N.Y. Feb. 10, 2011) (no bond where agreement permitted an injunction), *aff'd*, 468 F. App'x 43 (2d Cir. 2012). Third, no bond is required in a case like this one where there already have been violations, demonstrating that Premier is very likely to prevail on the merits of its claims. *See Town of Brookhaven v. Sills Road Realty*, No. CV 14–2286(GRB), 2014 WL 2854659, at *11 (E.D.N.Y. June 23, 2014) (declining to require posting of bond); *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 313 (S.D.N.Y. 2010) (same).

## CONCLUSION

For the foregoing reasons, Premier respectfully requests that this Court issue a preliminary injunction and temporary relief as specified in the Order to Show Cause.

Dated: New York, New York
July 18, 2016

Respectfully submitted,

**CROWELL & MORING LLP**

By: _____

Daniel D. Edelman
Elizabeth A. Figueira
590 Madison Avenue
New York, NY 10022
(212) 223-4000
dedelman@crowell.com

*Attorneys for Plaintiff Premier Fixtures, LLC*