```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x
                                                                 )
PREMIER FIXTURES, LLC,                                           )
                                                                 )  Case No. 2:16-cv-03975 (LDW)(AKT)
                             Plaintiff,                          )
                                                                 )
           v.                                                    )
                                                                 )
EVOLUTION FIXTURES, LLC, JOSE L.                                 )
TELLEZ, J. ANTONIO TELLEZ, TKL                                   )
ASSOCIATES, INC., PAUL                                           )
SAUDINO, and HARRY MAYORS,                                       )
                                                                 )
                             Defendants.                         )
---------------------------------------------------------------- X

STATE OF NEW YORK         )
                          ) ss.:
COUNTY OF SUFFOLK         )
```

**AFFIDAVIT OF NELSON GOODMAN IN SUPPORT OF PLAINTIFF'S MOTION
FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, NELSON GOODMAN, being duly sworn, hereby affirm and state under penalty of perjury:

1. I am the President of Plaintiff Premier Store Fixtures, LLC ("Premier" or the "Company") in the above-captioned action.

2. I make this affidavit in support of Premier's motion for a temporary restraining order and preliminary injunction in the above-captioned action. The facts in this affidavit are based on my personal knowledge, except where stated on information and belief based on my inquiry into the subject matters.

I.     **PREMIER STORE FIXTURES**

   A.     **Premier's Operations**

3.     I, along with Carlos Zurita and Jose Tellez ("Jose") initially co-founded Premier Store Fixtures, Inc. ("Premier Inc.") in 2000, which ultimately became Premier.

4.     By 2013, Premier had become a leading provider of customized interior fixtures and merchandising displays for the retail industry. We provide design and engineering, manufacturing, and logistics services to retailers for the opening, refreshing, and remodeling of stores located across North America, and assist retailers in the roll-out of new products.

5.     While Premier's headquarters are located in Long Island, New York, we also have facilities in Virginia, Illinois and on the West Coast. We are also a global company, doing business through state-of-the art manufacturing facilities in China and Taiwan and offices in Hong Kong.

6.     Premier has expended significant resources on design engineering capabilities so that we can create engineer designs that are tailored specifically to each client's particular needs. Premier's Design Department possesses full graphic development and printing capabilities, using the very latest design software. Premier's engineering department complements the designers' efforts. All engineering is performed and documented in-house using cutting-edge 3D design and development software.

7.     Several major retail brands have trusted Premier to engineer the design of their store layouts, fixtures and retail programs. Some examples are American Eagle Outfitters, Dick's Sporting Goods, Phillips Van Heusen, Field and Stream, Finish Line, Nike, and Teva.

8.     In addition, we currently service clients across industries, including but not limited to: (1) sporting goods; (2) hardware; (3) apparel; (4) footwear; (5) arts & crafts; (6)

cosmetics; (7) banking; (8) electronics; (9) automotive; (10) food services; and (11) pharmaceuticals.

9. To develop and maintain solid relationships with our clients, Premier has expended significant time, resources and investment, which has enabled us to garner substantial customer goodwill with many companies, especially among branded sporting goods, apparel and other major branded retailers.

10. Premier closely guards its knowledge of particular customers' sales history, in-house contacts, budgets, preferences and future corporate plans. All designs and engineering information that are created for a particular customer are password-protected.

B. **Premier's Policies and Guidelines to Safeguard Confidential Information**

11. The Company has always emphasized to its employees the need to protect confidential and proprietary information. In addition to requiring passwords for access to certain Company documents and information, Premier's Employee Handbook (the "Handbook") provides instructions about safeguarding confidential information. A true and correct copy of the current Handbook is attached hereto as Exhibit A.

12. The Handbook clearly states that "[t]he protection of confidential business information and trade secrets is vital to the interests and the success of Premier. Such confidential information includes, but is not limited to, the following examples: Computer Programs and Codes, Customer Lists, Customer Preferences, Financial Information, Marketing Strategies, Pending Projects and Proposals, and Research and Development Strategies."

13. The Handbook warns that "[e]mployees who improperly use or disclose trade secrets or confidential business information will be subject to disciplinary action, up to and including termination or employment, even if they do not actually benefit from the disclosed information."

14. The Handbook also makes clear that "[e]mail may not be used to solicit other commercial ventures… outside organizations, or other nonbusiness matters" and "[e]mployees should not use a password, access a file, or retrieve any stored communication without authorization." It explicitly warns that "[e]mployees who violate this policy will be subject to disciplinary action, up to and including termination of employment."

15. The Handbook outlines the types of conduct that is prohibited with regard to use of the Company's confidential information. These include (1) "ending or posting confidential materials, trade secrets, or proprietary information outside of the organization"; (2) "[a]ttempting to break into the computer system"; and (3) "[j]eopardizing the security of the organization's electronic communications systems."

16. As an additional safeguard, Premier also requires certain executives and employees to sign non-disclosure agreements. Indeed, as a founder of Premier who has served in various capacities since 2000, Jose has signed several agreements acknowledging his duty to keep Premier's business information and trade secrets confidential.

## II. EVOLUTION STORE FIXTURES

### A. Evolution's Website and Online Presence

17. Before June 2016, I had never heard of a company called Evolution Store Fixtures ("Evolution"). I only learned of Evolution's existence when Premier's Director of Design alerted me that Paul Saudino's LinkedIn profile showed that he had assumed a new position with a business called Evolution Store Fixtures.

18. Saudino was Premier's Director of Engineering from September 2010 through June 2016. In May, 2016, Saudino informed me that he was resigning from Premier. He said only that he would probably be returning to his "old company." Saudino submitted a resignation

email, indicating that he would be leaving Premier as of May 20, 2016. A true and correct copy of the Paul Saudino's resignation email is attached hereto as Exhibit B.

19. During his years of employment with Premier, Saudino has had access to Premier's trade secrets and confidential and proprietary information, including, but not limited to, the drawings and other specifications related to specific customer's custom-designed fixtures. He was also aware of the pricing for those fixtures and the logistics of manufacturing those fixtures overseas.

20. Based on Saudino's LinkedIn Profile, we learned that he had become Evolution's Vice President Design & Engineering for Evolution as of June 2016. We also noted that Paul's wife, Susan Saudino, was now employed by Evolution as a Senior Project Manager. A true and correct copy of Paul Saudino's LinkedIn profile is attached as Exhibit C.

21. Then we learned from Evolution's LinkedIn pages that Tony Tellez, who formerly served as Premier's Chief Operating Officer and held other positions at the Company, was the President of Evolution. While Tony Tellez had been terminated in 2013, his Separation Agreement still prohibited him from using and disclosing without Premier's consent any of Premier's confidential information. Evolution's LinkedIn page contained photographs and other designs that were from Premier projects. A true and correct copy of the Evolution LinkedIn page is attached as Exhibit D.

22. From there, we at Premier checked out Tony Tellez's LinkedIn profile, which confirmed his role at Evolution. A true and correct copy of Tony Tellez's LinkedIn profile is attached as Exhibit E.

23. We at Premier also accessed Evolution's web site, which showed that Evolution was clearly featuring work done by Premier. The website showcased photos from Premier

projects. Shortly after we accessed the wesbsite, Evolution took it down for a while and removed those photos. A true and correct copy of pages and images from Evolution's web site are attached as Exhibit F.

24. According to the current website, Evolution had assembled a "team" of "experts" who had experience working on fixtures business for thirteen major customers, all of whom were Premier customers. These included some of Premier's most significant customers including Dick's Sporting Goods, Phillips Van Heusen, Academy Sports, American Eagle Outfitters, Nike and Target. Evolution's website also showcases photos from Premier projects. A true and correct copy of Evolution's current web site pages are attached as Exhibit G.

25. Finally, we reviewed Evolution's Facebook profile, which featured a "Project of the Week" that was actually Premier's work for Footlocker's "House of Hoops." A true and correct copy of a screenshot of the Project of the Week picture is attached hereto as Exhibit H.

    B.    **The Mavis Email**

26. On Friday, June 24, 2016, we received information from one of Premier's Chinese vendors, Xiamen Mavis Display Fixtures Co., Ltd. ("Mavis") that Evolution was seeking business from Mavis. Mavis explained in a June 24th email that Evolution was requesting quotes as to "DSG" or Dick's Sporting Goods, one of Premier's largest customers. A true and correct copy of the June 24 email from Mavis is attached as Exhibit I.

27. The following Monday, June 27, 2016, Mavis forwarded to Premier an email that it had received from Evolution on April 12, 2016 (the "Mavis Email"). The Mavis email contained two attachments. One was a Request for Quote ("RFQ"). The other appeared to be nine pages of designs and drawings that Premier had prepared for ball holder fixtures that Premier produced for Dick's Sporting Goods. A true and correct copy of the Mavis Email and

attachments, with Premier's confidential and proprietary trade secrets redacted, is attached hereto as Exhibit J.

28. The Mavis Email was sent by "Jose A. Tellez" from an email address of [jatellez@evolutionfixtures.com](jatellez@evolutionfixtures.com) to Mavis and copied to Tony Tellez with an email address of [ttellez@evolutionfixtures.com](ttellez@evolutionfixtures.com).

29. The Mavis email stated: "Attached please find our RFQ #10002 along with drawing of the item. The finish is P-7 Glimmer on your B95161 (JINGYUAN). Also, customer has requested Silk Screen Logo per sample below to be imprinted on sign holder channel as shown on page 9 of the attached drawing." The Wilson Sporting Goods logo of a lowercase script "w" on red background appears at the end of the email.

30. The Mavis Email appears to be signed by Tony Tellez and contains contact information for Evolution in Jacksonville Florida.

31. The RFQ attached to the Mavis Email seeks a quote from Mavis by April 13, 2016 for 11,040 "Multi Ball Holder – P7 Glimmer w/Red w/Wilson logo" with the part number "DSG-MSHLDR-G-W." The "DSG-MSHLDR" part number is a number that Premier uses for ball holder fixtures it has produced for Dick's Sporting Goods.

32. The "drawing of the item" identified in the Mavis Email referred to the nine-page attachment containing Premier's drawings, designs and specifications for the ball holder fixtures Premier had produced for Dick's. We are calling these drawing the "Ball Holder Specs."

33. The Ball Holders Specs were easily identifiable as Premier's trade secrets, given that each page featured:

    a. Premier's logo;

    b. A legend stating "[t]his drawing and design are the intellectual property of Premier Store Fixtures, Inc. Any reproduction or alteration without written permission from PSF is prohibited";

    c. An "author" box with the initials "JDC," referring to Premier engineer Jeremy Conlon; and

    d. The part number "DSG-MBHLDR," which is Premier's unique label in its database.

34. The Ball Holder Specs were drawn in-house at Premier by Conlon in March and April 2014 as a part of a 2014 rollout of ball holder fixtures for all of Dick's Sporting Goods stores. Defendant Saudino had no role in the design of the Ball Holders Specs and did not have a role on the Dick's account.

35. At that time, Jose Tellez was still Premier's senior executive. The final approved copy of the Ball Holder Specs shows that Jose Tellez approved them on April 24, 2014. The first page of Ball Holder Specs' final version is stamped in the top right hand corner: "Approved by Jose Tellez at 2:18 p.m. Apr. 24, 2014." A true and correct copy of this 2014 version of the Ball Holder Specs, with Premier's confidential and proprietary trade secrets redacted, is attached as Exhibit K.

36. In 2014, Premier shared "Top Level Drawings" of the Ball Holder Specs with Dick's Sporting Goods. These are limited to the first three pages of the Ball Holder Specs. Premier did not – and would not – share the full nine pages containing the comprehensive set of designs, drawings and specifications, however, with Dick's or anyone outside of Premier except for the vendors that were responsible for the manufacturing. Those vendors were bound by either confidentiality or non-disclosure agreements not to share information.

37. Premier produced ball holder fixtures for Dick's in each of 2014 and 2015. Toward the end of March 2016, Dick's asked Premier to produce ball holder fixtures this year with the Wilson Sporting Goods logo affixed to the fixture's base. Dick's wanted the fixtures to be produced and delivered to all Dick's stores by the third week of June 2016.

38. Premier provided pricing to Dick's for producing fixtures with the Wilson logo on the morning of April 11, 2016. Later that month, Premier learned from Dick's that the Company's services were not needed this year to produce the ball holder fixtures.

39. We at Premier later learned from an import tracking record found on a subscription service ([www.panjiva.com](www.panjiva.com)) that a different Chinese vendor, Xiamen Constant Imp. & Exp. Trading Co. ("Constant") manufactured the 2016 ball holder fixtures for Evolution. A true and correct copy of the Panjiva tracking record is attached as Exhibit L.

40. The import tracking record shows that Constant shipped and delivered the ball holder fixtures to Evolution at the Port of Long Beach, California on June 5, 2016. From there, Evolution would have been responsible for delivering the fixtures to all 665 Dick's stores before receiving payment.

### III. COMMUNICATIONS WITH DICK'S SPORTING GOODS

41. After receiving the Mavis Email, I had several conversations with Dick's Senior Director of Purchasing, Gregg Graves ("Graves") about Evolution's recent efforts to get work from Dick's.

42. Graves informed me that Jose Tellez had reached out to him around the end of 2015 or the beginning of 2016 to inquire about Evolution doing work for Dick's Sporting Goods. Graves asked Jose Tellez whether he was allowed to be having these communications with Dick's because at the time Jose was a consultant for Premier. Jose answered that he was seeking the business on behalf of his brother, Tony Tellez.

43. Graves told me that Evolution completed the qualification process with Dick's Procurement Department in order to become eligible to bid for projects. He confirmed that Evolution was one of three bidders for the ball holder fixtures project. Dick's paid Evolution around $66,000 for the work, and the ball fixtures were delivered to Dick's stores in around June of this year.

44. Graves estimated me that he and Jose had about seven to ten conversations total over the course of the past several months. Graves stated that he was no longer taking Jose's calls or responding to any text messages.

45. On July 11, 2016, I summarized my telephonic conversations with Graves in an email. Graves replied back that my description was accurate. A true and correct copy of the email exchange between me and Mr. Graves is attached as Exhibit M.

46. No one at Premier gave Jose Tellez permission to speak with Gregg Graves or anyone at Dick's, one of Premier's most important customers.

## IV. UNAUTHORIZED COMMUNICATIONS WITH PREMIER'S OTHER CUSTOMERS

47. We at Premier have also learned from my contacts with other customers that Jose Tellez has been engaging in communications with additional Premier customers other than Dick's.

48. We at Premier communicated with representatives from Academy Sports and Phillips Van Heusen. Both indicated Jose Tellez and Evolution have solicited work from them. They also indicated that Evolution has used Premier's confidential and proprietary information, including pricing information, in soliciting that work.

## V.      COMMUNICATING AND SOLICITING PREMIER EMPLOYEES

49. We at Premier have also spoken with several Premier employees who have reported that Jose has been consistently communicating with various employees at all levels of seniority, even though Jose is not permitted to speak to Premier employees without the Company's written approval. No approval was ever given to Jose to conduct conversations with any of these Premier employees.

50. We at Premier have also reviewed telephone records from Premier-issued cellphones to see if employees used those phones to speak with Jose or Tony Tellez.

51. During at least the first quarter of 2016, Harry (Hank) Mayors ("Mayors"), Premier's former head of IT, had extensive communications with Jose Tellez. Mayors' Premier phone records show, among others calls with Jose Tellez, a 77-minute call on February 26, 2016 and a 67-minute call on March 11, 2016.

52. Jose Tellez hired Mayors to work at Premier in 2006. Before that time, Mayors worked at Stafford Computer Associates ("Stafford"). Stafford is the computer company that houses Premier's computer servers. Mayors had been the main contact and liaison between Stafford and Premier.

53. Mayors' very last recorded call on his work phone records was to Evolution Store Fixtures itself in Jacksonville Florida on Saturday April 2, 2016. I have now learned that Evolution began using Stafford to host its website on April 2, 2016.

54. Less than a week later, on the morning of Friday, April 8, 2016, Mayors unexpectedly resigned from Premier, claiming only unspecified "personality conflicts." A true and correct copy of the Mayors' resignation email is attached hereto as Exhibit N. I believe that Jose encouraged Mayors to assist him and Tony with Evolution.

-11-

55. From conversation with other Premier employees, we learned that Jose had been communicating with other Premier employees. He even invited three of Premier's warehouse employees from Richmond, Virginia, to New York to discuss Evolution. The names of those employees are Hugo Roman, Luis Alvarez and Gabriel Serna.

56. After the meeting, Roman disclosed to other Premier employees that he and Alvarez and Serna had met with Jose Tellez in New York during the week of June 6, 2016, to discuss joining Evolution and that he intended to do so by January 2017.

57. Alvarez's telephone records confirm that, after the New York meeting, he began contacting realtors and mortgage brokers in the Jacksonville, Florida area, demonstrating that he planned to relocate to join Evolution as well.

58. In addition, Jose Tellez has reached out and even invited to dinner other Premier employees, presumably for the purpose of inducing them to leave Premier for Evolution.

## VI. PREMIER AGREEMENTS WITH JOSE TELLEZ AND TONY TELLEZ

### A. Agreements with Jose Tellez

59. Premier Inc.'s assets were acquired by Premier Fixtures LLC in an asset purchase transaction on October 31, 2013. As a stockholder of Premier, Inc., Jose Tellez signed and agreed to an Asset Purchase Agreement ("APA") that same day. Jose Tellez agreed to confidentiality, non-competition and non-solicitation restrictions in Article X of the APA that are to last through October 31, 2018. A true and correct copy of the APA is attached as Exhibit O.

60. As a result of the asset purchase transaction, Jose Tellez received over $5 million dollars. This included $135,714 as consideration for the restrictive covenants contained in the APA's Article X. Jose Tellez also received equity consideration in the form of a percentage of membership units in Premier.

-12-

61. In conjunction with the APA, Jose Tellez also agreed to an Employment Agreement with Premier on October 31, 2013, in which he was to function as Premier's Senior Executive. The 2013 Employment Agreement also contained restriction prohibiting Jose Tellez from using and disclosing Premier's confidential information and imposed on his non-competition and non-solicitation obligations.

62. The 2013 Employment Agreement provided Jose Tellez with an annual base salary of $350,000 before incentive compensation. Between November 1, 2013 and July 17, 2014, Jose Tellez received $352,715.40 from Premier.

63. On July 17, 2014, Jose Tellez entered into a Separation Agreement and Release of Claims ("Jose's Separation Agreement") with the Company. A true and correct copy of Jose's Separation Agreement is attached hereto as Exhibit P.

64. As part of Jose's Separation Agreement, he entered into a Consulting Agreement with the Company that guaranteed him compensation including incentive compensation. A true and correct copy of the Consulting Agreement is attached hereto as Exhibit Q.

65. As consideration for his services and adherence to contractual obligations, Jose Tellez was paid $1,206,169.58 for being a consultant from July 2014 through July 2016.

66. Jose Tellez also agreed to confidentiality restrictions and restrictive covenants in the Consulting Agreement. Those restrictions were largely similar to the ones in the APA that already bound Jose through October 31, 2018.

67. Section 1 of Jose Consulting Agreement provided that his services for the Company were constrained by the restrictions specified in Exhibit 1.

68. The Exhibit 1 restrictions prohibited Jose Tellez from "contact[ing] and engag[ing] in discussions" with anyone at the Company other than "the Company

Representative," or "any other employees of the Company who are previously approved in writing by the Company."

69. He also agreed in Exhibit 1 "that in no event" would he "contact or engage in any discussions" with any customer or vendor of the Company "unless previously approved by the Company."

70. In Section 4 to the Consulting Agreement, Jose Tellez agreed to "be bound by and abide by the terms of" an attached "Restrictive Covenant Agreement." This agreement contained similar restrictions to those in Jose Tellez' 2013 Employment Agreement, regarding the use and disclosure of Premier' confidential information as well as non-competition and non-solicitation of customers, vendors and employees.

71. Less than one month after signing the Consulting Agreement, on August 6, 2014, Premier's lawyers wrote to Jose Tellez's lawyer to advise that Jose had not been abiding by the communications' restraints in the Consulting Agreement, stating "[a]s a reminder, Premier's obligations (including payment of Mr. Tellez's compensation) under the Consulting Agreement are conditioned upon, Mr. Tellez's compliance with the terms thereof, and any future correspondence or contact with employees, customers or vendors of Premier will be handled in the manner set forth in the Consulting Agreement." A true and correct copy of the August 6, 2014 correspondence from Premier's lawyers to Jose Tellez's lawyer (without its attachments) is attached here to as Exhibit R.

72. On July 25, 2015, Tailwind Capital acquired all of the member interest in Premier. As a result of the Tailwind transaction, Jose Tellez's net proceeds from selling his equity interests in the limited liability company totaled $8,655,000. Jose thus received a total of nearly $14,000,000, as consideration for the sale of Premier Inc. to Premier Fixtures LLC.

73. Between October 31, 2013 and the present, Premier has paid Jose Tellez approximately $15.2 million.

74. On July 18, 2016, Premier terminated Jose Tellez's Consulting Agreement for cause, as a result of our investigation showing that he had materially breached the APA and his Consulting Agreement.

### B. Agreement with Tony Tellez

75. Tony Tellez was terminated from his employment with Premier in June 2013. At that time, Tony Tellez entered into a separation agreement ("Tony's Separation Agreement") with Premier on behalf of himself and as President of TKL Associates Corp ("TKL").

76. Pursuant to Section 3 of his Separation Agreement, Tony Tellez received "Separation Benefits" for a one-year period.

77. Section 3(a), however, expressly conditioned these payments upon Tony's compliance with all of the terms and conditions of the Agreement. Thus, in the event of a breach by Tony Tellez, Premier is also entitled to the return of all commissions and severance payments that were made to him. Section 11 also permitted Premier to seek injunctive relief in the event of breach.

78. Section 8 of the Separation Agreement provides that Tony Tellez and TKL would not disclose to any third party or make use of Premier's proprietary and confidential information for a period of three years after his termination, until June 3, 2016.

79. Tony Tellez and TKL agreed that they would return all copies of documents containing confidential information to Premier and that "such confidential information shall remain solely the property of Premier."

80. In addition, Tony Tellez and TKL agreed in Section 10 of Tony's Separation Agreement to certain "[c]ontinuing obligations" to "not, without the prior written consent of Premier, use any such [confidential] information for [their] personal benefit" or "disclose [confidential information] to any third party unless such information had been previously disclosed publicly by [Premier] or is required to be disclosed by law."

*Nelson Goodman*
Nelson Goodman

Sworn to and subscribed before me
this 18th day of July, 2016

*Rose Rosario*
Notary Public

**ROSE ROSARIO**
**NOTARY PUBLIC-STATE OF NEW YORK**
No. 01RO4702816
Qualified in Suffolk County
My Commission Expires June 30, 2019